**Olga HOCHFELDER, et al.,**
**Plaintiffs-Appellants,**

v.

**MIDWEST STOCK EXCHANGE,**
**Defendant-Appellee.**

**Leon S. MARTIN et al.,**
**Plaintiffs-Appellants,**

v.

**MIDWEST STOCK EXCHANGE,**
**Defendant-Appellee.**

Nos. 72–1977, 72–1978.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 18, 1973.

Decided April 10, 1974.

Certiorari Denied Oct. 15, 1974.
See 95 S.Ct. 137.

Willard L. King, Donald L. Vetter, Alex Elson, Willard J. Lassers, Chicago, Ill., for plaintiffs-appellants.

Milton H. Cohen, Chicago, Ill., for defendant-appellee.

Before SWYGERT, Chief Judge, CASTLE, Senior Circuit Judge, and SPRECHER, Circuit Judge.

SWYGERT, Chief Judge.

This is an appeal by plaintiffs from a grant of summary judgment in favor of defendant, Midwest Stock Exchange. Plaintiffs are various individuals[1] who were victimized by a securities fraud perpetrated by Leston B. Nay, President of First Securities Company of Chicago and owner of ninety-two percent of its stock. First Securities was registered with the Securities and Exchange Commission as a broker-dealer in securities and was a member of the Midwest Stock Exchange and the National Association of Securities Dealers, Inc. Each member organization in the Midwest Stock Exchange had a nominee or "member officer" who would represent the member organization for certain purposes, such as casting its vote in Midwest matters or trading on the Exchange floor. Nay was First Securities' member officer or nominee in the Midwest Stock Exchange, a position which he applied for and was admitted to in 1945.

The facts surrounding Nay's fraudulent scheme are set forth in detail in our opinion in Securities & Exch. Com'n v. First Securities Co. of Chicago, 463 F.2d 981 (7th Cir. 1972), and need only be briefly restated. Plaintiffs were brokerage clients of First Securities, buying and selling securities through First Securities in regular fashion. Each plaintiff received investment advice from Nay, and each knew Nay to be the president of First Securities. Nay induced the plaintiffs to place funds in an "escrow" account which Nay represented would pay interest to plaintiffs at a high rate of return (generally twelve percent per annum, but later reduced to nine percent). Nay's fraudulent scheme came to light in 1968 as a result of a suicide note left by him describing First Securities as bankrupt due to his thefts and indicating that certain "escrow" accounts created by him were "spurious." Plaintiffs were among the investors in these spurious escrow accounts.

Nay's actions were violative of the federal securities laws and First Securities was derelict in fulfilling its duties pursuant to the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq. Securities & Exch. Com'n v. First Securities Co. of Chicago, 463 F.2d 981 (7th Cir. 1972).

1. The plaintiffs in appeal No. 72–1977, Olga Hochfelder, et al., filed an action on February 19, 1971 in district court against the Midwest Stock Exchange in the first count of the complaint, and against Ernst & Ernst, certified public accountants, in the second count. On May 18, 1971 a separate but identical complaint was filed by plaintiffs Leon S. Martin, et al., in appeal No. 72– 1978. Midwest filed a motion for summary judgment applicable to both cases. By stipulation and subsequent order of the district court, the ruling in favor of Midwest in case No. 72–1977 was applied in case No. 72–1978. The appeals were consolidated by stipulation of the parties and our order of December 6, 1972.

The thrust of plaintiffs' present action, asserting violations of the Securities Exchange Act of 1934, is that Midwest was negligent in scrutinizing Nay's application as a member officer and failed thereafter to adequately investigate his continued fitness as a member, and as a result of its action and inaction Midwest aided and abetted Nay's violation of the 1934 Act.

In resolving whether summary judgment was correctly granted to Midwest we must first inquire whether there was a genuine issue of material fact as to the liability of Midwest. Butterman v. Walston & Co., 387 F.2d 822 (7th Cir. 1967). The district court found there to be none and, as our opinion will demonstrate, we agree. Since no material facts are in dispute we must then make inquiry whether, on the basis of the uncontroverted facts, the district court correctly found as a matter of law that Midwest has incurred no liability under the Securities Exchange Act of 1934. The specific issues to be decided are: (1) whether Midwest fulfilled its duties as a national securities exchange under section 6 of the Securities Exchange Act of 1934; (2) whether Midwest aided and abetted by action or inaction any violation of Rule 10b–5 by Nay under the Securities Exchange Act of 1934; and (3) whether plaintiffs' claims against Midwest are barred by the statute of limitations. The district court determined these issues favorably to Midwest and granted summary judgment. We affirm.

## I

It is plaintiffs' contention that Midwest inadequately scrutinized Nay's application in 1945 for the position of member officer or nominee of First Securities and as a result Nay was improperly admitted to membership in Midwest. Also, plaintiffs assert that various events and alleged violations of Midwest rules were sufficient to put Midwest on notice that Nay was no longer fit for membership and that Midwest's failure to inquire into these matters was a dereliction of duty. Plaintiffs claim that Midwest's alleged negligence in admitting Nay to membership and allowing him to continue as a member in the Exchange was a violation by Midwest of section 6(a)(1) of the Securities Exchange Act of 1934.

Midwest is a national securities exchange registered with the Securities and Exchange Commission pursuant to section 6 of the 1934 Act and accordingly must fulfill the duties imposed under that section. Section 6(a)(1) provides that an exchange shall "enforce so far as is within its powers compliance by its members, with the provisions [of the 1934 Act and the rules and regulations thereunder]." Section 6(b) obligates the exchange to promulgate rules to "include provision for the expulsion, suspension, or disciplining of a member for conduct or proceeding inconsistent with just and equitable principles of trade," the violation of any provision of or rule under the 1934 Act being deemed conduct inconsistent with such principles. It is these provisions that prescribe in rather broad language the duties of self-regulation incumbent on Midwest as a registered exchange. With respect to the section 6 duty of self-regulation there are two inquiries which generally must be made: (1) the scope of the duties owed; and (2) whether the duties owed run to the plaintiffs.

At the outset we need not reach the question of whether the duties owed run to the plaintiffs for, assuming *arguendo* they do, we find that the duties owed were adequately fulfilled. Although the section 6 duty of self-regulation is framed in broad language, "to enforce so far as is within its powers", it is not a mandate of strict liability rendering the exchange a guarantor of all fraudulent schemes consummated by its members whether in listed or unlisted securities. To so read section 6 would tear at the very fabric of self-regulation, a burden which indeed no self-regulatory body could bear. The scope of the duty of self-regulation is not so far reaching. Rather, the scope must be

delineated to include only those acts, events, schemes, or circumstances surrounding exchange members of which the exchange knows or has reasonable cause to know, or those events and circumstances which would reasonably put the exchange on notice, of a violation or suspected violation of a securities law, regulation or rule or, exchange rule.[2] It is only in the face of these circumstances that a failure to proceed with the requisite due care and conduct would be a dereliction of the duty of self-regulation. Measuring the duty of self-regulation to the present action, we find that Midwest, on the basis of the uncontroverted evidence in this case, did not fail to exercise the requisite care and conduct in admitting Nay to membership and allowing him to maintain his membership.

Plaintiffs assert that Midwest failed to exercise due care in reviewing Nay's application for membership in that: (1) Midwest did not discover Nay's change of his first name from Ladislas to Leston at the age of eighteen upon migration to the United States from Hungary; (2) Midwest did not investigate the circumstances surrounding the voluntary liquidation in 1942 of Webber, Darch & Company for whom Nay had been an officer and director; (3) Midwest made no inquiry of Halsey, Stuart & Company where Nay had been employed for the period 1921 through 1933; and (4) Midwest made no investigation into the circumstances surrounding Nay's prior two divorces. It is plaintiffs' contention that Midwest failed to exercise the requisite care in scrutinizing Nay's continued fitness to remain a member in view of alleged warnings of Nay's dubious integrity and desperate financial condition, namely: (1) Nay's insistence in 1949 on employing Joseph F. Hammel as a security salesman despite the fact that Midwest's investigation of Hammel produced evidence that Hammel had falsified his employment application; (2) Nay's request in 1959 of permission from Midwest to pledge his stock in First Securities for a personal loan; although Midwest denied Nay's request, it did not inquire into the reasons for Nay's request to pledge all his stock; (3) Midwest's awareness of the fact that First Securities had experienced a net capital deficiency in late 1967 in violation of Midwest's rules; (4) Nay's borrowings from First Securities beginning in 1957; although Midwest approved of each borrowing, it did not investigate Nay's financial situation; and (5) Midwest's failure to request and examine copies of Nay's federal income tax returns which it is claimed would have demonstrated Nay's position of insolvency.

■ With respect to plaintiffs' charge of failure to appropriately screen Nay's application for membership, we find that the investigatory procedures employed by Midwest in 1944 were sufficient to satisfy the section 6 duty of self-regulation. Those procedures in-

---

2. In Baird v. Franklin, 141 F.2d 238 (2d Cir. 1944), cert. denied, 323 U.S. 737, 65 S.Ct. 38, 89 L.Ed. 591 (1944), a case of first impression, the Second Circuit held that the New York Stock Exchange had a duty "to investigate the dealings and the financial conditions of the members and to suspend or expel members who it had reason to believe had been guilty of conduct inconsistent with just and equitable principles of trade." 141 F.2d at 239. The test of liability articulated by the Second Circuit was proof that the Exchange had "knowledge or reasonable cause to suspect that [the Exchange member] was guilty of conduct inconsistent with just and equitable principles of trade. . . ." 141 F.2d at 243.

We have previously addressed ourselves to the test of liability applicable in determining whether an exchange satisfied the duty of self-regulation. In Butterman v. Walston & Co., 387 F.2d 822 (7th Cir. 1967), rehearing denied (1968), cert. denied, 391 U.S. 913, 88 S.Ct. 1806, 20 L.Ed.2d 652 (1968), we held the New York Stock Exchange not liable for a member firm's violation of the Exchange rules where it could be found that the Exchange "had no knowledge, or reasonable way of gaining knowledge, of alleged violations," and no duty to suspend or expel "until it had, or should have had, knowledge of violation or suspected violation." 387 F.2d at 825.

cluded among others letters of recommendation from banks and member organizations of Midwest; two sponsors of the applicant from member organizations appeared before the Admissions Committee of the Midwest Exchange to answer questions with respect to Nay's application; Nay appeared before the Admissions Committee and answered questions pertaining to his application; and a notice of Nay's proposed admission to the Exchange was sent to all members of Midwest requesting them to inform the Admissions Committee of any reason known to them which would indicate that Nay was unfit for membership in the Exchange.

■■ We fail to find merit in plaintiffs' contention that Midwest should have investigated the circumstances surrounding Nay's change of first name and his divorces. These matters had no relevancy. Although Midwest did not inquire of Nay's one time employer, Halsey, Stuart & Company, and did not investigate further into the circumstances surrounding the voluntary liquidation of Webber, Darch & Company with whom Nay had been associated, in view of the admission procedures employed in 1945 it cannot be said that Midwest's failure to look into or pursue further these matters demonstrated a failure to exercise due care in scrutinizing Nay's application for membership.

Addressing ourselves to the issue of whether Midwest exercised due care in investigating Nay's continued fitness for membership, plaintiffs contend that various events and circumstances taking place between 1949 through April, 1968 should have put Midwest on notice that Nay no longer possessed the requisite character and moral integrity required of an Exchange member. It is also contended that if Midwest had pursued these so-called warnings further, it would have discovered Nay's involvement in the fraudulent escrow scheme.

The first alleged warning of Nay's dubious integrity occurred in 1949 when Nay asked Midwest to reconsider his request for permission to employ Joseph F. Hammel as a security salesman even though Midwest's investigation of Hammel had uncovered evidence that Hammel had falsified his employment application. Although Nay offered to employ Hammel in a restrictive capacity, namely dealing exclusively in transactions in municipal bonds with institutional clients, Midwest adhered to its denial of permission.

Plaintiffs argue that Nay's request of Midwest to reconsider Hammel's employment in a restrictive capacity should have put Midwest on notice of Nay's questionable integrity and suspect fitness for membership. We do not agree with this argument. Plaintiffs do not assert that Nay knew of Hammel's false statements prior to Midwest's investigation of Hammel nor do they contend that Nay's actions amounted to a violation of Exchange rules. In viewing this matter in hindsight, plaintiffs have placed undue importance on it.

Plaintiffs claim that in 1959, ten years after the employment incident, Midwest received its second warning of Nay's unfitness for membership, but failed to take appropriate action. Nay as ninety-two percent stock owner in First Securities requested permission from Midwest to pledge his stock holdings in First Securities for a personal loan he wished to obtain from a Chicago bank. Nay made his request pursuant to the Exchange rules. Although Midwest denied Nay permission to pledge his stock, plaintiffs maintain that the request should have put Midwest on notice that Nay was in serious financial straits and that, in any event, the request was of sufficient magnitude to put a burden of inquiry on Midwest to investigate Nay's personal reasons for such a loan. We are not convinced that Nay's request should have put Midwest on notice that Nay was in a financially desperate position. The request without additional facts was of a benign nature. Nor can we say that this request in conjunction with the employment incident ten years before was sufficient to put

Midwest on notice of any wrongdoings or in any way reflected unfavorably on Nay's fitness for membership. Plaintiffs assert that it was incumbent on Midwest to inquire into the reasons for the loan. Although we are cognizant of the magnitude of Nay's request, we are not prepared to place a burden of inquiry on an exchange which would effectively require scrutiny and investigation into all the personal affairs and activities of member nominees or the personal, business, and financial affairs of those individuals closely associated with member organizations. In this same vein plaintiffs contend that as part of the duty of self-regulation it was incumbent on Midwest to obtain and examine copies of Nay's federal income tax returns, which it is asserted would have uncovered Nay's fraudulent escrow scheme. As is true of the contention that Midwest should have investigated the reasons for Nay's personal loan, to require Midwest to inspect Nay's personal tax returns would impose a burden on Midwest to investigate into events not related to matters reflected in a member organization's books and records. Although Midwest used a protective system to assure responsibility and integrity in the handling of public customer business which focused primarily on the books and records reflecting the activities of member organizations,[3] plaintiffs argue that the system was insufficient because it failed to go beyond the member organization and investigate personal books and records, if any, reflecting the personal activities and affairs of member nominees. This asserted burden of inquiry would be applicable not solely to those individuals similarly situated to Nay; rather, the burden of inquiry would likewise be applicable to everyone associated with any member organization who might possibly be engaged in a personal, remote, and carefully concealed fraudulent scheme. To place such a burden on Midwest to inquire into affairs unrelated to the activities of the Exchange would be tantamount to making the Exchange a guarantor of losses resulting from every fraudulent, personal scheme engaged in by individuals associated with member organizations. Indeed, the implementation of such a burden of inquiry might well be counter-productive in that it would dissipate resources which are limited and needed for the basic self-regulatory actions in scrutinizing matters pertaining to member organization activities and affairs.

Plaintiffs next contend that a series of loans made by First Securities to Nay from 1957 to 1968 should have put Midwest on notice of Nay's precarious financial condition and asserted unfitness for Midwest membership. Nay borrowed money from First Securities during this eleven year span and pursuant to Exchange rules notified Midwest of

3. Midwest's rules provided that only corporations and partnerships could deal directly with the public. Accordingly, Midwest's surveillance program was directed towards member organizations and not the personal books and records of officers or employees of member firms.

The surveillance program imposed by Midwest was elaborate. Midwest's own staff periodically conducted a "field examination" which consisted of an examination and inspection of the books and records of member organizations. This was supplemented by interviews with personnel of the member firm. The written field examination program was in compliance with S.E.C. suggestions.

The Exchange rules required each member organization to submit to Midwest each year two audited financial questionnaires, one of which was to be certified by an independent public accountant selected and retained by the member organization. The audits were performed pursuant to S.E.C. Form X–17A–5, as amended from time to time by the S.E.C. In 1962 the annual certified audit was changed by Midwest to a surprise audit whereby the member organization would not know when the audit was scheduled to begin. The independent certified public accountant's audit would be reviewed by Midwest to verify compliance with the applicable rules. In addition the audit was required to include a review of the member organization's system of internal controls. Midwest would conduct its field examination at a time other than the fiscal period for which the surprise audit was made.

the borrowings. The frequency of the borrowings and the total amount of the borrowings were not of such an unusual nature so as to put Midwest on notice of any wrongdoing by Nay.[4] Nor can it be said that the combined events—the employment incident, the request to pledge stock, and the continuous borrowings— were sufficient to put Midwest on notice that Nay was no longer fit to continue as a member of the Midwest Stock Exchange.

The final event which plaintiffs assert reflected unfavorably on Nay's integrity concerned the circumstances surrounding First Securities' temporary net capital deficiency in October, 1967.[5] In the course of its routine analysis of First Securities' September 30, 1967 financial questionnaire, Midwest determined that First Securities was not in compliance with the net capital rules of the Exchange. Immediate action was taken and First Securities was advised on October 27 of the deficiency and requested to take appropriate steps to rectify the situation. First Securities was also warned that a failure to cure the situation within a reasonable time could lead to its suspension from the Exchange. On November 3 Nay informed the Exchange that First Securities had a net capital deficiency of $9,332 as of October 31, 1967. Nay also indicated that First Securities' independent certified public accountant, Ernst & Ernst, was engaging in a surprise audit pursuant to Exchange rules of the financial period ending October 31, 1967 and that the net capital deficiency would be appropriately explained. Ten days later Nay notified Midwest that he had reduced his indebtedness to First Securities thereby restoring First Securities to full compliance with the Exchange's net capital requirements as of October 31, 1967. On December 6, 1967 in response to an inquiry by Ernst & Ernst, Midwest indicated that the October 31, 1967 financial questionnaire prepared by Ernst & Ernst on the basis of its surprise audit need not reflect the temporary net capital deficiency since it had been corrected in early November by Nay's reduction of his indebtedness to First Securities. On that same day Midwest advised Nay that First Securities' November 30, 1967 financial questionnaire indicated a net capital excess of $22,000 and that therefore Nay would be granted permission to borrow $10,000 from First Securities.

Plaintiffs contend that Midwest encouraged Ernst & Ernst to make a material omission on the October 31, 1967 questionnaire which was to be submitted to Midwest and that Midwest sanctioned a mere token repayment of $10,000 since Nay was allowed to borrow $10,000 from First Securities in early December. Plaintiffs charge that these events were sufficient to place a duty on Midwest to investigate Nay and, presumably, his personal financial affairs and continued fitness for Midwest membership. Because of the nature of the financial questionnaire and the fact it was prepared for Midwest's usage, we need not indulge in a technical analysis of whether it accurately depicted First Securities' financial position as of October 31, 1967, nor are we convinced that Nay's subsequent borrowing rendered the earlier repayment meaningless. Indeed, the evidence indicates that Midwest was alert in discovering the deficiency and took immediate steps to have it corrected. Viewing this event with all the other asserted warnings, we are not convinced that *in toto* they were sufficient

---

4. As of November 30, 1967 Nay had borrowed $74,500 from First Securities as compared to his share of the net worth in the corporation of approximately $120,000.

5. The "net capital rules" of the various exchanges and of the S.E.C. require that a broker-dealer's "aggregate indebtedness" must never be more than a specified percentage of its net capital. The "net capital" reflects the liquidity of the broker-dealer and is a conservative figure which is in general substantially less than "net worth." See, e. g., Report of the Special Study of Securities Markets of the Securities and Exchange Commission, H.R.Doc.No.95, 88th Cong., 1st Sess. (1963), pt. 1, ch. III, p. 407.

to put Midwest on notice that further inquiry was warranted.

■ Having examined the asserted warnings and Midwest's response thereto, we find that as a matter of law the warnings do not demonstrate a lack of due care in scrutinizing Nay's continued fitness for membership in Midwest. Accordingly, we hold that Midwest satisfied its duty of self-regulation.

Moreover, even assuming that Midwest breached its duty of self-regulation in that the net capital deficiency discovered in October, 1967 was, either by itself or in combination with the prior events, sufficient to put Midwest on notice that Nay was engaging in fraudulent conduct and no longer qualified for membership in the Exchange, plaintiffs are confronted with yet another obstacle which they cannot overcome, namely, a lack of causal connection.

In Baird v. Franklin, 141 F.2d 238 (2d Cir. 1944), cert. denied, 323 U.S. 787, 65 S.Ct. 38, 89 L.Ed. 591 (1944), the Second Circuit, in fashioning a duty of self-regulation under section 6, held that an essential element of liability grounded on a section 6 violation was proof of a causal connection between an exchange's breach of duty and the plaintiffs' asserted losses; further, that the plaintiffs had the burden of proving causation. Recognizing that the defendant stock exchange had breached its duty of self-regulation the court went on to find that the plaintiffs had failed to prove causation:

> We accede to the view that the Stock Exchange violated a duty when it failed to take disciplinary action against Richard Whitney on November 24, 1937, after there was reason to believe that the latter had converted the plaintiffs' securities. But to justify a judgment in favor of either plaintiff, such a breach of duty must have resulted in damage that can be traced to the breach . . . . In the case of the Exchange there was no duty except to investigate the dealings and the financial conditions of the

members and to suspend or expel members who it had reason to believe had been guilty of conduct inconsistent with just and equitable principles of trade. It appears from the record that by reason of unauthorized pledges the securities had all been converted prior to November 24, 1937, and were then in the possession of pledgee banks and so remained for some time thereafter, though at certain times all of them were returned to the pledgor and during the same day repledged to secure other loans. We can see no likelihood that the expulsion or suspension of Richard Whitney when his conversions came to the notice of the officers of the Exchange on November 24, 1937, would have in the least benefited the plaintiffs for the securities were then all converted and in the hands of pledgees. 141 F.2d at 239.

■ Assuming · Midwest's failure to act in late 1967 amounted to a breach of duty, it would nevertheless appear to be of no consequence to plaintiffs' losses. Plaintiffs had departed with their money many years prior to 1967. Some of the escrow transactions were entered into as early as 1942 with the bulk of the transactions being completed in the 1950's and the last escrow transaction consummated in 1966. Plaintiffs admit that by 1967 Nay was hopelessly insolvent and apparently he possessed no substantial assets. Even if Midwest had satisfied its duty of self-regulation, assuming a derelection, it would have been of no avail to plaintiffs. At that time their losses could not have been avoided in whole or part. Accordingly, there is no proof available, to show a causal connection between plaintiffs' ·losses and the asserted breach of duty in late 1967.

## II

■ Plaintiffs contend that pursuant to section 6 of the Securities Exchange Act of 1934 Midwest had a duty to enforce Rule 27(c) of Article III of the Rules of Fair Practice of the National

Association of Securities Dealers, Inc. In Securities & Exch. Com'n v. First Securities Co. of Chicago, 463 F.2d 981 (7th Cir. 1972), cert. denied, 409 U.S. 880, 93 S.Ct. 85, 34 L.Ed.2d 134 (1972), we held First Securities, a member of the N.A.S.D., liable for Nay's fraud, due to its failure to enforce Rule 27.[6] As a member of the N.A.S.D. it was incumvent on First Securities to enforce the N.A.S.D. rules. In this action plaintiffs request that we place a duty on Midwest as a national securities exchange to enforce the rules of another self-regulatory organization, namely, the N.A.S.D., a national securities association. Without facing the question whether even the N.A.S.D. as promulgator of Rule 27 could

be liable because of its member's non-compliance, plaintiffs would have us place an additional burden on Midwest to enforce the rules of another self-regulatory body. There is nothing in the 1934 Act which mandates this unique theory. Indeed, the imposition of such a burden of enforcement would be unduly onerous and result in a wasteful duplication of actions in that Midwest would be expected to enforce the rules of all self-regulatory organizations to which a member firm might belong. This would be contrary to the avowed intention of Congress and the Securities and Exchange Commission that there be more coordination and less duplication of self-regulatory activities.[7] We hold that

6. Rule 27 in pertinent part provides:
   (a) Each member [of the Association] shall establish, maintain and enforce written procedures which will enable it to supervise properly the activities of each registered representative and associated person to assure compliance with applicable securities laws, rules, regulations and statements of policy promulgated thereunder and with the rules of this Association.
   (b) Final responsibility for proper supervision shall rest with the member . . . .
   (c) Each member shall be responsible for keeping and preserving appropriate records for carrying out the member's supervisory procedures. Each member shall review and endorse in writing, on an internal record, all transactions and all correspondence of its registered representatives pertaining to the solicitation or execution of any securities transaction.
   Nay had forbidden anyone other than himself to open mail addressed to him, and in his absence all such mail was allowed to accumulate on his desk, even if it was addressed to First Securities for his attention. This rule facilitated and fostered Nay's perpetration of the escrow fraud. As a result, we held that First Securities' enforcement of Nay's practice regarding the opening of mail was sufficient on its face to constitute a violation of Rule 27. 463 F.2d at 988.

7. To impose such a wide-ranging duty of enforcement would be in direct opposition to the recommendation in the Report of the Special Study of Securities Markets of the Securities and Exchange Commission to improve efficiency and economy of the total regulatory effort by avoiding duplication:

This report indicates various ways in which the quantity and quality of self-regulation and/or governmental regulation need strengthening. On the other hand, available mechanisms, budgets, and personnel of some agencies already seem overtaxed, and at the same time there appears to be considerable duplication of effort . . . . In the interests of the public, the regulatory agencies and the securities industry, further and continuing attention should be given to possibilities for coordinating efforts and allocating responsibilities in a more efficient and productive pattern . . . Report of the Special Study of Securities Markets of the Securities and Exchange Commission, H.R.Doc. No.95, 88th Cong., 1st Sess. (1963), pt. 4, ch. III, p. 738.
Congress followed this approach to effective self-regulation through clear division of labor among self-regulatory bodies when it enacted the Securities Investor Protection Act of 1970, 15 U.S.C. § 78aaa et seq. In section 9(c), 15 U.S.C. § 78iii(c), Congress provided that where a member of the Securities Investor Protection Corporation, the S.I.P.C., whose membership includes nearly all broker-dealers, is a member of more than one self-regulatory organization, the S.I.P.C. shall designate one of such organizations to inspect or examine the S.I.P.C. member "for compliance with applicable financial responsibility rules." The goal "that more coordination is needed for planning, for surveillance, and for elimination of duplication" was recently reaffirmed by the House Subcommittee on Commerce and Finance. Securities Industry Study of the Subcommittee on Commerce and Finance of the Committee on Interstate and Foreign Commerce, H.R.

Midwest was under no duty to enforce Rule 27(c) of the Rules of Fair Practice of the N.A.S.D.

### III

Plaintiffs claim that in view of the alleged warnings of Nay's desperate financial condition and dubious integrity, Midwest's action or inaction amounted to aiding and abetting Nay's violation of Rule 10b–5. The charge of aiding and abetting is grounded on two contentions: Midwest aided and abetted solely by inaction; Midwest's affirmative action of issuing Nay a Midwest membership wall plaque was of itself or in combination with Midwest's omission to act sufficient to make out a claim of aiding and abetting a Rule 10b–5 violation.

■ Confronting the charge of aiding and abetting solely by inaction we note that it is well established that one may aid and abet by inaction in combination with affirmative action. *See* Brennan v. Midwestern United Life Insurance Co., 417 F.2d 147 (7th Cir. 1969), cert. denied, 397 U.S. 989, 90 S. Ct. 1122, 25 L.Ed.2d 397 (1970); Buttrey v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 410 F.2d 135 (7th Cir. 1969), cert. denied, 396 U.S. 838, 90 S. Ct. 98, 24 L.Ed.2d 88 (1969). However, in those cases where we have stated that one may aid and abet solely by inaction, we reached a finding of liability on the basis of affirmative action in combination with inaction. *See, e. g.,* Brennan v. Midwestern Life Ins. Co., 259 F.Supp. 673 (N.D.Ind.1966); Anderson v. Francis I. DuPont & Co., 291 F.Supp. 705 (D.Minn.1968). Indeed, in the only case where it may fairly be stated that the court was faced with a claim of aiding and abetting solely by inaction, the Ninth Circuit declined to accept such a theory of Rule 10b–5 liability stating:

> There is not a scrap of authority supporting this extraordinary theory of Rule 10b–5 liability, and we will not supply any in this case.

We find nothing in Rule 10b–5 that purports to impose liability on anyone whose conduct consists solely of inaction . . . . We perceive no reason, consonant with the congressional purpose in enacting the Securities and Exchange Act of 1934, thus to expand Rule 10b–5 liability (*Cf.* SEC v. Texas Gulf Sulphur Co., *supra,* 401 F.2d 833 at 866–868 (J. Friendly, concurring specially).) On the contrary, the exposure of independent accountants and others to such vistas of liability, limited only by the ingenuity of investors and their counsel, would lead to serious mischief. Wessel v. Buhler, 437 F.2d 279, 283 (9th Cir. 1971).

■ Keeping in mind the frequent admonition of the Supreme Court that courts must be alert to provide such remedies for securities frauds as to make effective the Securities Acts, SEC v. Capital Gains Bureau, 375 U.S. 180, 195, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963); Tcherepnin v. Knight, 389 U.S. 332, 336, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967); Mills v. Electric Auto-Lite Co., 396 U.S. 375, 386, 90 S.Ct. 616, 24 L. Ed.2d 593 (1970), we are not prepared to hold that a claim for aiding and abetting solely by inaction cannot be made under Rule 10b–5. In invoking such a rule, however, we would not go so far as to charge a party with aiding and abetting who somehow unwittingly facilitated the wrongful acts of another. Rather, to invoke such a rule investors must show that the party charged with aiding and abetting had knowledge of or, but for a breach of duty of inquiry, should have had knowledge of the fraud, and that possessing such knowledge the party failed to act due to an improper motive or breach of a duty of disclosure. Plaintiffs do not and could not contend that Midwest had actual knowledge of Nay's fraudulent escrow scheme. And, as our analysis of Midwest's section 6 duty of self-regulation demonstrates, Midwest adequately satisfied its duty

Rep.No.92–1519, 92nd Cong., 2d Sess. 115 (1972). The imposition of the burden of enforcement advocated by plaintiffs would indeed be a major obstacle to attaining the goal of coordination of efforts and elimination of duplicative waste.

of inquiry and had no reason to know of or suspect Nay's fraudulent escrow scheme. Failing proof that Midwest knew or should have known of Nay's fraud we need not further our inquiry into the other elements of a claim for aiding and abetting solely by inaction.

We then turn to plaintiffs' contention that Midwest aided and abetted by affirmative action in that it negligently issued and allowed Nay to maintain a Midwest membership plaque which plaintiffs assert they relied on in making their investments in the spurious escrow account. Plaintiffs expend considerable efforts in arguing that the plaque was a representation or certification of Nay's integrity in all financial matters and that plaintiffs reasonably relied on this representation in participating in the escrow scheme.[8] We do not reach the question of the scope of Midwest's representation through the medium of the plaque or the reasonableness of plaintiffs' reliance thereon. Rather, we find that having fulfilled its section 6 duty of self-regulation, it cannot be said that Midwest was negligent in issuing and allowing Nay to maintain the plaque. Absent proof of negligence, we will not stand in willingness to impose a standard of strict liability on Midwest due to its issuance of the plaque. Accordingly, we hold plaintiffs' charge of aiding and abetting through the affirmative action of issuing a plaque to be without merit.

### IV

The district court held that the appropriate statute of limitations had run prior to the filing of this action in February, 1971. Plaintiffs contended that the equitable tolling doctrine prevented the statute from beginning to run until Nay's fraud was discovered in 1968 at the time of his suicide. If plaintiffs' invocation of the equitable tolling doctrine had been allowed it is clear that their respective actions would have been timely filed. In rejecting plaintiffs' contention, the district court held, "To toll the statute, the defendant must have actively concealed the cause of action, and Midwest clearly was not shown to have done this." Hochfelder v. Midwest Stock Exchange, 350 F.Supp. 1122, 1125 (N.D.Ill.1972). The equitable tolling doctrine provides that where a fraud which is the foundation of the suit has actively been concealed or is of such a nature as to conceal itself, the statute of limitations is tolled until the plaintiff has obtained knowledge of the fraud or in the exercise of due care should have obtained knowledge of the fraud. Bailey v. Glover, 88 U.S. (21 Wall.) 342, 349, 22 L.Ed. 636 (1874); Holmberg v. Armbrecht, 327 U.S. 392, 396, 66 S.Ct. 582, 90 L.Ed. 743 (1945); Morgan v. Koch, 419 F.2d 993, 997 (7th Cir. 1969). The gravamen of plaintiffs' action against Midwest is admittedly grounded in negligence, and is not grounded on any contention that Midwest is chargeable with affirmative acts of fraud or fraudulent concealment. However, we do not believe that the tolling doctrine should be so narrowly drawn that it does not encompass Midwest's alleged acts of facilitation of the fraud.

It is charged that Midwest's conduct amounted to negligence and that its negligence facilitated or provided the means for Nay's fraud. Nay effectively concealed his fraud and as a result the alleged implementing negligence of Midwest was concealed and brought to the surface only when the facts surrounding Nay's fraud were first discovered. If

---

8. The plaque contained the following language:

MIDWEST STOCK EXCHANGE
Organized 1882

An Association for Brokers, Whose Object is to Establish and Conduct a Market for Listed Securities, where High Standards of Commercial Honor and Integrity are maintained and Just and Equitable Principles of Trade and Business prevail.

LESTON B. NAY
of
First Securities Company of Chicago
/s/ Carl E. Ogren          /s/ James E. Day
     Secretary                    President
(This Certificate is the Property of Midwest Stock Exchange).

claims brought in the same posture as the instant action—asserting charges amounting to negligence but short of fraud—are to have any vitality, it cannot be contended that the tolling doctrine should not apply. Often the underlying fraud, carefully concealed in and of itself, would cloak the implementing actions of others. Accordingly, where the acts of a defendant facilitate the perpetration of a concealed fraud of another, the bar of the statute of limitations should not begin to run until a plaintiff obtains knowledge or through due diligence should have obtained knowledge of the underlying fraud. In view of our holding on the merits of plaintiffs' claims, however, we need not otherwise further our inquiry with respect to the litigants' contentions regarding the statute of limitations.

On the basis of the foregoing the judgments of the district court are affirmed.