Leonard BRAWER, Plaintiff,

v.

The OPTIONS CLEARING CORPORA-TION and American Stock Exchange, Inc., Defendants.

No. 85 Civ. 2148 (LLS).

United States District Court, S.D. New York.

April 29, 1986.

A. Arnold Gershon, New York City, for plaintiff; Schiff, Hardin & Waite, Chicago, Ill., Burton R. Rissman, of counsel.

Seward & Kissel, New York City, for defendant The Options Clearing Corp., M. William Munno, of counsel.

Lord, Day & Lord, New York City, Eugene F. Bannigan, Gordon L. Nash, for defendant American Stock Exchange, Inc.

## OPINION and ORDER

STANTON, District Judge.

Defendants The Options Clearing Corporation ("OCC") and American Stock Exchange, Inc. ("AMEX") move pursuant to Fed.R.Civ.P. 12(b)(6) to dismiss the complaint for failure to state a claim upon which relief can be granted, on the ground that there is no private right of action under the applicable provisions of the Securities Exchange Act of 1934 ("Exchange Act" or "Act"), 15 U.S.C. § 78a *et seq.*, under which plaintiff sues; and pursuant to Fed.R.Civ.P. 9(b) for failure to allege fraud or bad faith with the requisite particularity.

### Background

The AMEX and OCC are both "self-regulatory organizations" ("SROs") under the Exchange Act, 15 U.S.C. § 78c(a)(26). The AMEX is registered as a national securities exchange pursuant to § 6 of the Exchange Act, 15 U.S.C. § 78f, and OCC is a registered clearing agency pursuant to § 17A of the Act, 15 U.S.C. § 78q–1. Plaintiff is an investor who wrote options on stock issued by Phillips Petroleum Company ("Phillips"). The AMEX provides an exchange market for the trading of options with standard terms, and options on Phillips stock were and are listed and traded at the AMEX. All trades in these options are cleared by the OCC.

Plaintiff alleges that at the close of business on March 1, 1985, he held short positions in put options on Phillips stock, under which he was obligated to purchase Phillips stock at the exercise price if the holder of the option required it of him. Between the close of business on March 1, 1985 and the opening of business on March 4, 1985, Phillips, then the target of a hostile takeover, announced a financing scheme or "offer",[1] whereby it would issue a package of debt securities in return for approximately half of its outstanding shares of stock. The Phillips plan was formally announced by a prospectus dated March 4, 1985. While the plaintiff's explanation of the plan's effect upon him is less than clear, it is evident that it caused the price of Phillips stock to fall substantially and thus increased the value of put options and the burdens on plaintiff in meeting his obligations as a writer of puts.

Pursuant to AMEX Rules 902 and 903[2] and OCC By-Laws, Article VI, Section 11

---

**1.** Whether Phillip's activities constituted a plan of recapitalization or a tender offer is disputed by the parties; however, the distinction is not material to this motion.

**2.** The relevant parts of AMEX Rules 902 and 903 read as follows:

902(a) Subject to the provisions of Rules 905, 907 and 909, the rights and obligations of holders and writers of option contracts of any class of options dealt in on the Exchange shall be as set forth in the rules of the Options Clearing Corporation.

(the "OCC Adjustment Rule"),[3] when a company announces a reorganization that affects its securities, the Securities Committee, consisting of two representatives of each Exchange on which option contracts in that underlying security are trading and the Chairman of the OCC, shall "make such adjustments in the exercise price ... as that Committee in its sole discretion determines to be fair" to the holders and writers of option contracts. Upon the announcement by Phillips of its financing plan, defendants' representatives duly met but decided to make no adjustment to the options on Phillips stock.

Plaintiff claims that defendants should have reduced his burdens by an adjustment such as altering his obligation to purchase under the puts he had written, or reducing the exercise price. He alleges that defend-

ants, in failing to adjust option contracts on Phillips stock in response to Phillip's "plan of recapitalization", failed to comply with their own rules and thus violated §§ 6(b), 17A(b)(3) and 19(g)(1) of the Exchange Act, respectively 15 U.S.C. §§ 78f(b), 78q–1(b)(3) and 78s(g)(1). Although those sections do not expressly grant plaintiff a private right of action against defendants, he argues that such a right of action is implied to allow an injured investor to sue an exchange or clearing agency which fails to comply with its own rules.

Plaintiff relies heavily on *Baird v. Franklin*, 141 F.2d 238 (2d Cir.), *cert. denied*, 323 U.S. 737, 65 S.Ct. 38, 89 L.Ed.2d 591 (1944), in which the Court of Appeals for the Second Circuit held that an investor had a private right of action, under the then § 6(b) of the Act,[4] against an ex-

903(c) The unit of trading and the exercise price initially established for option contracts of a particular series are subject to adjustment in accordance with the rules of the Options Clearing Corporation. When such adjustment or adjustments have been determined, announcement thereof shall be made by the Exchange and, effective as of the time specified in such announcement, the adjusted unit of trading and the adjusted exercise price shall be applicable with respect to all subsequent transactions in such series of options.

(d) Option contracts shall be subject to adjustments in accordance with the rules of the Options Clearing Corporation.

**3.** The OCC Adjustment Rule reads in pertinent part as follows:

SECTION 11. Whenever there is declared a ... reorganization, recapitalization or reclassification or similar event in respect of any underlying security, the number of outstanding option contracts, the unit of trading and/or the exercise price with respect to all option contracts open for trading in that underlying security shall be adjusted, effective on the "ex-date" of the underlying security in the primary market, in accordance with this Section 11....

(d) In the case of any reorganization, recapitalization, reclassification or similar event with respect to shares of underlying securities for which adjustment is not provided in any of the foregoing paragraphs of this Section 11, or in the case of any event for which adjustment is provided in one of the foregoing paragraphs but is not considered by the Securities Committee to be appropriate under the circumstances, the Securities Committee shall make such adjustments in the exercise price,

trading unit or number of contracts with respect to the option contracts affected by such event as that Committee in its sole discretion determines to be fair to the holders and writers of such option contracts.

(e) The Securities Committee, in exercising its functions pursuant to paragraphs (c) or (d) of this Section 11 regarding adjustment of option contracts in an underlying security, shall consist of two designated representatives of each Exchange on which option contracts in that underlying security are open for trading and the Chairman of [OCC]. The vote of a majority of the voting members of the Securities Committee shall constitute the action of the Committee. The Chairman of [OCC] shall not be a voting member of the Committee except in the case of a tie vote, in which case the Chairman shall have the right to cast a vote to break the tie and shall, for such purpose, be deemed to be a voting member. The members of the Securities Committee need not be Clearing Members or officers or directors of [OCC]. The Securities Committee may transact its business by telephone.

**4.** Old § 6 provided, in relevant part:

(b) "No registration shall be granted or remain in force unless the rules of the exchange include provision for the expulsion, suspension, or disciplining of a member for conduct or proceeding inconsistent with just and equitable principles of trade, and declare that the willful violation of any provisions of this title or any rule or regulation thereunder shall be considered conduct or proceeding inconsistent with just and equitable principles of trade."

(d) "If it appears to the Commission that the exchange applying for registration is so orga-

change for failure to enforce its rules. In that case the defendant New York Stock Exchange had failed to discipline a member broker firm which converted the plaintiff's securities, in violation of the Act and of the Exchange's Rules. At that time Section 6(b) provided that the SEC would not register an exchange unless its rules provided for appropriate discipline of its members for conduct "inconsistent with just and equitable principles of trade". Section 6(d) required that the exchange be "so organized as to be able to comply with the provisions of this title and the rules and regulations thereunder and that the rules of the exchange are just and adequate to insure fair dealing and to protect investors". Those sections imposed "the twofold duty upon an exchange of enacting certain rules and regulations and of seeing that they are enforced." *Baird* at 244. The court observed that a primary purpose of the Act is the protection of the general investing public, and that for that purpose it was necessary to grant investors "individual causes of action to enforce the statutory duties imposed upon the exchanges." *Id.*, at 245.

At that time, only two sections of the Act, §§ 19 and 32 (15 U.S.C. §§ 78s, 78ff), explicitly imposed sanctions on an exchange for violations, and they provided for the withdrawal of an exchange's registration and suspending or fining its officers or members. The court found both inadequate to protect the defrauded investor, since they were "punitive and remedial measures, rather than compensatory". *Ibid.* It held that to construe § 6 as granting no private right of action would defeat the statute's purpose of protecting investors. That the statute itself provided no procedure by which the injured investor could proceed was immaterial, because "[i]t is well established that members of a class for whose protection a statutory duty is created may sue for injuries resulting from its breach and that the common law will supply a remedy if the statute gives none." *Ibid; see Texas & P.R. Co. v. Rigsby*, 241 U.S. 33, 36 S.Ct. 482, 60 L.Ed. 874 (1916).

Plaintiff contends that *Baird* supports the conclusion that the present sections 6(b), 17A(b)(3) and 19(g)(1) imply he has a right of action against both defendants for their failure to comply with their rules.[5]

For over 30 years this Circuit and other federal courts followed *Baird* and recognized an implied right of action against an exchange under then § 6(b). *See Arneil v. Ramsey*, 550 F.2d 774 (2d Cir.1977); *Lank v. New York Stock Exchange*, 548 F.2d 61 (2d Cir.1977); *Rich v. New York Stock Exchange*, 522 F.2d 153 (2d Cir.1975); *Rich v. New York Stock Exchange*, 509 F.Supp. 87 (S.D.N.Y.1981); *Kroese v. New York Stock Exchange*, 227 F.Supp. 519 (S.D.N.Y. 1964); *Hughes v. Dempsey-Tegeler & Co.*, [1973 Transfer Binder] CCH Fed.Sec.L. Rep. ¶ 94, 133 (C.D.Cal.1974), *aff'd*, 534 F.2d 156 (9th Cir.1976), *see also Hochfelder v. Midwest Stock Exchange*, 503 F.2d 364 (7th Cir.), *cert. denied*, 419 U.S. 875, 95 S.Ct. 137, 42 L.Ed.2d 114 (1974) (assumed for purposes of the decision that § 6 created duty in Exchange enforceable in private action, but found no connection between losses and asserted breach of duty, and found in favor of defendant). At least one federal court did not. *See Walck v. American Stock Exchange, Inc.*, 687 F.2d 778 (3rd Cir.1982); *compare, Gustafson v. Strangis*, 572 F.Supp. 1154 (D.Minn.1983) (no private right of action under § 15A against NASD for failure to enforce rules).

nized as to be able to comply with the provisions of this title and the rules and regulations thereunder and that the rules of the exchange are just and adequate to insure fair dealing and to protect investors, the Commission shall cause such exchange to be registered as a national securities exchange."

5. In *Baird,* the Exchange failed to enforce compliance by a member with the Act and the Exchange's rules. In this action, no member is involved; the Exchange and OCC failed to comply with their own rules. The distinction does not appear to be significant to the determination whether there is a private right of action under § 6 against an exchange. *See Bright v. Philadelphia-Baltimore-Washington Stock Exchange*, 327 F.Supp. 495 (E.D.Penn.1971); *cf. New York Stock Exchange, Inc. v. Sloan*, 394 F.Supp. 1303 (S.D.N.Y.1975).

Significantly, however, every decision in this Circuit following *Baird* was decided on facts existing prior to the 1975 Amendments to the Exchange Act. Those Amendments restructured § 6, added new §§ 17A and 19(g), and strengthened the role of the SEC in overseeing the activities of SROs' to ensure that they act in the public interest. *See* §§ 19(h) and 21(d) and (e). As discussed more fully below, the Amendments end the continuing vitality of *Baird.*

A second development subsequent to most of the Second Circuit decisions following *Baird* is a series of Supreme Court decisions setting stricter standards for the implication of private remedies where statutes do not expressly provide them. Thus, although a private damages remedy was held to be implied in former § 6 of the Act, whether one should now be implied from the present statute is a different question.[6]

Discussion

1. The 1975 Amendments

Realizing that the securities industry was faltering under inefficiencies and inadequate regulation and enforcement, Congress amended the Act in 1975. Of significant concern were the SROs' failures to respond appropriately to their statutory obligations. In an effort to preserve their self-regulation yet increase regulatory oversight of SRO activities and functions, Congress amended the provisions dealing with SROs better to define their obligations, *see* §§ 6, 17A and 19(g), and simultaneously broadened the oversight and enforcement powers of the SEC. Sections 19(h) and 21(d) and (e). Congress developed a comprehensive scheme, contemplating that "self-regulation would be continued, but the SEC would be expected to play

a much larger role than it has in the past to ensure that there is no gap between self-regulatory performance and regulatory need." Senate Committee on Banking, Housing and Urban Affairs, S.Rep. No. 75, 94th Cong., 1st Sess. 23, *reprinted in* 1975 U.S.Code Cong. & Ad.News 179, 181 ("Senate Report").

In the new section 6(b), Congress for the first time expressly required that an exchange, to be registered, must enforce its own rules. That section directs, in relevant part, that—

(b) an exchange shall not be registered as a national securities exchange unless the Commission determines that—

(1) Such exchange is so organized and has the capacity to be able to carry out the purposes of this chapter and to comply, and (subject to any rule or order of the Commission pursuant to section 78q(d) or 78s(g)(2) of this title) to enforce compliance by its members and persons associated with its members with the provisions of this chapter, the rules and regulations thereunder, and the rules of the exchange.

The 1975 Amendments added § 17A to the Act, thus also providing for the first time for registration and SEC regulation of clearing agencies. That section reads, in relevant part, as follows:

(3) A clearing agency shall not be registered unless the Commission determines that—

(A) Such clearing agency is so organized and has the capacity to be able to facilitate the prompt and accurate clearance and settlement of securities transactions for which it is responsible, to safeguard securities and funds in its

---

**6.** The district courts in this Circuit, as well as other federal courts, are similarly reconsidering whether there is an implied remedy under § 6 against a broker-dealer for its violation of an exchange's rules. *See Picard v. Wall St. Discount Corp.,* 526 F.Supp. 1248 (S.D.N.Y.1981); *Jablon v. Dean Witter & Co.,* 614 F.2d 677 (9th Cir.1980). The Court of Appeals for the Second Circuit had first implied such a remedy in *Colonial Realty Co. v. Bache & Co.,* 358 F.2d 178 (2d Cir.), *cert. denied,* 385 U.S. 817, 87 S.Ct. 40, 17

L.Ed.2d 56 (1966), which held that a private cause of action may exist under § 6 of the Securities Act for violations of some N.Y.S.E. Rules. However, in light of the Supreme Court's new standards for implying remedies, as set forth in *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975) and subsequent cases, federal courts are re-evaluating whether such a right should be implied and finding that it should not. *Picard v. Wall St. Discount Corp.,* 526 F.Supp. at 1251.

custody or control or for which it is responsible, to comply with the provisions of this chapter and the rules and regulations thereunder, to enforce (subject to any rule or order of the Commission pursuant to section 78g(d) or 78s(g)(2) of this title) compliance by its participants with the rules of the clearing agency, and to carry out the purposes of this section.

The SROs' duty to comply with and enforce compliance with their own rules is found in new § 19(g)(1), which directs that—

(g)(1) Every self-regulatory organization shall comply with the provisions of this chapter, the rules and regulations thereunder, and its own rules, and (subject to the provisions of section 78q(d) of this title, paragraph (2) of this subsection, and the rules thereunder) absent reasonable justification or excuse enforce compliance—

(A) in the case of a national securities exchange, with such provisions by its members and persons associated with its members;

(B) in the case of a registered securities association, with such provisions and the provisions of the rules of the Municipal Securities Rulemaking Board by its members and persons associated with its members; and

(C) in the case of a registered clearing agency, with its own rules by its participants.

While making explicit the duty of a SRO to comply with its own rules, Congress simultaneously vested in the SEC the authority and obligation to enforce that duty. Section 19(h)(1) directs:

(h)(1) The appropriate regulatory agency for a self-regulatory organization is authorized, by order, if in its opinion such action is necessary or appropriate in the public interest, for the protection of investors, or otherwise in furtherance of the purposes of this chapter, to suspend for a period not exceeding twelve months or revoke the registration of such self-regulatory organization, or to censure or impose limitations upon the activities, functions, and operations of such self-regulatory organization, if such appropriate regulatory agency finds, on the record after notice and opportunity for hearing, that such self-regulatory organization has violated or is unable to comply with any provision of this chapter, the rules or regulations thereunder, or its own rules or without reasonable justification or excuse has failed to enforce compliance—

(A) in the case of a national securities exchange, with any such provision by a member thereof or a person associated with a member thereof;

(B) in the case of a registered securities association, with any such provision or any provision of the rules of the Municipal Securities Rulemaking Board by a member thereof or a person associated with a member thereof; or

(C) in the case of a registered clearing agency, with any provision of its own rules by a participant therein.

The SEC is "the appropriate regulatory agency" for the AMEX and OCC, 15 U.S.C. § 78c(a)(34). Section 19(h)(1) was added specifically to enforce § 19(g) and to "significantly increase the regulatory options available to [the SEC] to deal with perceived self-regulatory shortcomings." Senate Report, U.S.Code Cong. & Admin.News 1975, p. 212. The sanctions provided in § 19(h)(1) "are in addition to suspension and deregistration and are intended to provide more usable sanctions than the SEC's traditional 'big stick.' " [7] *Ibid.*

---

**7.** In addition to these enforcement powers, the SEC can abrogate or amend any SRO's rules. § 19(c). A SRO must file for approval with the SEC a copy of any proposed rule or rule change, accompanied by a statement with reasons for the proposal. § 19(b). Moreover, the SEC has authority to prescribe rules regulating the activities of clearing agencies if it is necessary in the public interest, to protect investors or in furtherance of the principles of the statute. § 17A(d)(1).

Moreover, Congress added §§ 21(d) and (e), which empower the SEC to apply to a federal court for injunctive relief against violations of its rules by an SRO or its members, and to compel an SRO to enforce compliance by its members, when it appears to the SEC that (1) the SRO is unable or unwilling to take appropriate action or (2) such action is necessary in the public interest or for the protection of investors. Section 21(f); *see* Senate Report, U.S.Code Cong. & Admin.News 1975, p. 213.

The addition of these expanded and more flexible powers argues that Congress selected the experience and the expertise of the SEC as the preferred source of remedies for an SRO's shortcomings. Rather than codifying *Baird*, as plaintiff argues, the revisions strengthened the system of self-regulation:

> Although self-regulation has not always performed up to expectations, on the whole it has worked well, and the Committee believes it should be preserved and strengthened. [The Amendments are] designed to accomplish this, not only by clarifying regulatory responsibilities at all levels but also by assuring that the self-regulatory organizations follow effective and fair procedures, that their activities are not anticompetitive and that the Commission's oversight powers are ample and its responsibility to correct self-regulatory lapses is unmistakable.

Senate Report, U.S.Code Cong. & Admin. News 1975, pp. 201–2.

Thus, the concerns expressed in *Baird* were recognized and addressed by the 1975 Amendments, whose scheme indicates that Congress did not wish to create compensatory sanctions against a SRO for failure to enforce its rules, as it could easily have done, but instead chose remedial measures with enforcement vested in the SEC.

### 2. *Cort v. Ash* and New Limitations on Private Rights of Action

Recent Supreme Court decisions reflect a shift in the Court's approach to the recurring question whether a federal statute implies a private right of action. "As our recent cases—particularly *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 [ (1975) ]—demonstrate, the fact that a federal statute has been violated and some person harmed does not automatically give rise to a private cause of action in favor of that person." *Cannon v. University of Chicago*, 441 U.S. 677, 688, 99 S.Ct. 1946, 1953, 60 L.Ed.2d 560 (1979); *see also Merrill Lynch, Pierce, Fenner & Smith v. Curran*, 456 U.S. 353, 377, 102 S.Ct. 1825, 1838, 72 L.Ed.2d 182 (1982) (new approach to implication of private remedies requires more careful scrutiny of legislative intent).

A four-factor test determines whether to infer a private remedy. The factors are whether (a) plaintiff is a member of a class for whose special benefit the statute was enacted; (b) there is any indication of legislative intent to create or deny such a remedy; (c) the implication of the remedy is consistent with the underlying purposes of the legislative scheme and (d) the cause of action is one traditionally relegated to state law. *Cort v. Ash*, 422 U.S. at 78, 95 S.Ct. at 2087. The central inquiry is "whether Congress intended to create, either expressly or by implication, a private cause of action." *Touche Ross & Co. v. Redington*, 442 U.S. 560, 575, 99 S.Ct. 2479, 2489, 61 L.Ed.2d 82 (1979); *see Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 15–16, 100 S.Ct. 242, 245, 62 L.Ed.2d 146 (1979).

(a) Class for whose *"especial* benefit the statute was enacted"

In determining this factor, the court looks to "the language of the statute itself", *Cannon v. University of Chicago*, 441 U.S. at 689, 99 S.Ct. at 1953 (1979). It is clear that both new § 6 and § 17A were enacted for the benefit of investors and the public. Section 6 includes as a prerequisite to the registration of an exchange that its rules "are designed ... in general, to protect investors and the public interest"; § 6(b)(5); *see also* § 6(a); *Walck v. American Stock Exchange*, 687 F.2d at 783. Similarly, § 17A(b)(3) provides that a clearing agency will not be registered unless its

rules "are designed … in general, to protect investors and the public interest". § 17A(b)(3)(F); *see also* § 17A(a)(1)(A).

"[T]he mere fact that the statute was designed to protect [investors] does not require the implication of a private cause of action for damages on their behalf … The dispositive question remains whether Congress intended to create any such remedy." *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. at 24, 100 S.Ct. at 249 (citations omitted); *see also Walck v. American Stock Exchange, Inc.,* 687 F.2d at 783–84. Supplementing the SEC's enforcement powers, Congress stated that those powers are to be invoked by the SEC when it believes enforcement action is "necessary or appropriate in the public interest" or "for the protection of investors". *See* §§ 19(h)(1), 19(h)(4) and 21(f). Thus while § 6 and § 17A were indeed enacted for the protection of investors, it is the SEC that will provide that protection.

There is no indication that the statute was enacted to benefit any particular class of investors such as holders or writers of options.

**(b) Legislative intent**

The second *Cort* factor looks to the legislative intent. The appropriate materials to examine are those of the 1975 Amendments. The relevant changes and additions were discussed above, and the concept informing the amendments favors increased supervision and regulation by the SEC, with more sensitive and flexible enforcement capacities, rather than the implication of a private remedy.

None of sections 6, 17A or 19 mention a private remedy. Congress provided private remedies under other sections of the Act, §§ 9(e), 16(b) and 18, and "[o]bviously, then, when Congress wished to provide a private damages remedy, it knew how to do so and did so expressly." *Touche Ross & Co. v. Redington,* 442 U.S. at 572, 99 S.Ct. at 2487. While the fact that Congress did not expressly so provide here does not foreclose the implication of a private remedy under these sections, *see Transamerica v.*

*Lewis,* 444 U.S. at 19, 100 S.Ct. at 246, the Senate Report shows that Congress did consider the necessity of improved enforcement and chose to vest that power in the SEC. The Report expresses legislative intent to preserve self-regulation in the industry and to rely on the SEC for enforcement of SROs' performance.

**(c) Purposes of the legislative scheme**

If an implied remedy would be "necessary or at least helpful to the accomplishment of the statutory purpose", it weighs in favor of implication. *Cannon v. University of Chicago,* 441 U.S. at 703, 99 S.Ct. at 1961. Here, to imply a remedy under § 6 would frustrate Congress' purposes.

In *Baird,* the court found a need for a private right of action because the SEC enforcement powers were not appropriate for protection of the investor. At that time, and until 1975, a SRO's obligation to comply and enforce compliance with its own rules was not explicit in the statute and the SEC's enforcement powers, to the extent they could be invoked for such purposes, were limited and extreme. *See* Jennings, "Self-Regulation in the Securities Industry: The Role of the Securities and Exchange Commission", 29 Law and Contemporary Problems 663, 671–2 and 682 (1964); *see also Walck v. American Stock Exchange,* 687 F.2d at 784–85. That is no longer the case, since Congress has made explicit the duties of the SROs' and vested broad and flexible powers in the SEC to see that those duties are performed and investors are protected.

The nature of the OCC Adjustment Rule is such that the implication of a private cause of action could undermine the ability of the OCC and AMEX to perform their functions. The rule vests in the Securities Committee, composed of representatives of the AMEX and OCC, broad discretion to determine to what extent adjustments should be made in fairness to all investors when the issuer's unforeseen transaction affects the underlying security. Necessarily, any decision the Committee makes will

benefit one group of option investors at the expense of another. Granting such investors private rights of action against such decisions would invite litigation each time the Committee functioned, undermine the self-regulation contemplated by the Act, and remove options adjustment decisions to federal courts rather than the appropriate agencies.

### The Preservation Doctrine

■ Plaintiff argues that under *Merrill Lynch v. Curran*, 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982) the private remedy first implied in *Baird* should be "preserved" since the legislative history of the 1975 Amendments does not indicate otherwise. *Curran* holds that where "Congress acts in a statutory context in which an implied private remedy has already been recognized by the courts, ... the question ... is whether Congress intended to preserve the pre-existing remedy", not whether Congress intended to create a new remedy. *Id.*, at 378–79, 102 S.Ct. at 1839.

*Curran* involved an action for damages by an investor in commodity futures contracts against his brokers for violations of a provision of the Commodity Exchange Act ("CEA") and three actions by speculators in futures contracts against the New York Mercantile Exchange for its failure to enforce its own rules. The CEA was substantially amended in 1974 to create and grant regulatory and enforcement powers to the Commodity Futures Trading Exchange Commission, among other things. The 1974 amendments, like the original legislation, did not mention private remedies for investors injured by a violation of the CEA. The Court found that, since prior to the amendments "federal courts [had] routinely and consistently ... recognized an implied private cause of action" under the CEA, *id.*, at 379, 102 S.Ct. at 1839, and the existence of the private remedy was "well understood", *id.*, at 380, 102 S.Ct. at 1840, Congress had intended to preserve private remedies for investors against exchanges and its participants for violation of the CEA.

That is not the situation here. Although it appears that an implied cause of action under § 6 was equally "well understood" prior to the 1975 Amendments, *but see Hochfelder v. Midwest Stock Exchange*, 503 F.2d 364 (7th Cir.), *cert. denied*, 419 U.S. 875, 95 S.Ct. 137, 42 L.Ed.2d 114 (1974), several other factors suggest that Congress did not intend to preserve a private right of action under § 6 when it enacted the 1975 Amendments.

In *Curran*, the Court found specific evidence in the legislative history, suggesting that Congress was aware of and wished to preserve the implied cause of action, intending the new procedures for relief to supplement rather than supplant the judicial remedy. *See id.*, at 382–88, 102 S.Ct. at 1841–44. No such evidence appears here regarding the 1975 Amendments, whose intent is rather to centralize enforcement power in the SEC and preserve the system of self-regulation.

In *Curran*, amidst a "comprehensive reexamination and significant amendment" of the CEA, Congress had left intact the statutory provisions under which the federal courts had implied a cause of action. *Id.*, at 381, 102 S.Ct. at 1841. This showed that "Congress affirmatively intended to preserve that remedy." *Id.*, at 381–82, 102 S.Ct. at 1841. That is not so here. Congress did not leave intact, but changed, the sections on which plaintiff relies. Those sections were restructured or added as part of the legislative scheme described above, defining the SROs' obligations and vesting the SEC with enhanced powers to regulate them.

Accordingly, the observations and reasoning in *Curran* do not lead to the conclusion that Congress intended to preserve a private cause of action under § 6(d) when it amended the Exchange Act.

### Conclusion

Accordingly, it is unnecessary to consider the point of pleading raised by the defendants. For plaintiff's lack of a private right of action, the complaint is dismissed.

So ordered.