Leonard BRAWER, Plaintiff-Appellant,

v.

The OPTIONS CLEARING CORPORA-
TION and American Stock
Exchange, Inc., Defendants-Appellees.

No. 102, Docket 86–7416.

United States Court of Appeals,
Second Circuit.

Argued Oct. 8, 1986.

Decided Dec. 11, 1986.

**298**

A. Arnold Gershon, P.C., New York City, for plaintiff-appellant.

Roger Pascal, Chicago, Ill. (Burton R. Rissman, Joseph H. Nesler, Schiff Hardin & Waite, Chicago, Ill.; M. William Munno, Seward & Kissel, New York City, of counsel), for defendant-appellee The Options Clearing Corp.

Lord, Day & Lord, New York City (Eugene F. Bannigan, Gordon L. Nash, Laurie E. Foster, Monica A. Derham, of counsel), for defendant-appellee The American Stock Exchange, Inc.

Richard A. Kirby, Asst. Gen. Counsel, S.E.C., Washington, D.C. (Paul Gonson, Solicitor, Daniel L. Goelzer, Gen. Counsel, Jacob H. Stillman, Associate Gen. Counsel, Leslie E. Smith and Katharine Gresham, Attorneys, S.E.C., Washington, D.C., of counsel), as amicus curiae.

Before LUMBARD, CARDAMONE, and PIERCE, Circuit Judges.

LUMBARD, Circuit Judge:

Leonard Brawer appeals from a judgment dismissing his complaint against defendants The Options Clearing Corporation (OCC) and American Stock Exchange, Inc. (AMEX) entered in the Southern District by Judge Louis L. Stanton on April 29, 1986. Brawer's complaint alleges that OCC and AMEX violated §§ 6(b), 17A(b)(3), and 19(g)(1) of the Securities Exchange Act of 1934, as amended (the Act), 15 U.S.C. §§ 78f(b), 78q–1(b)(3), and 78s(g)(1) respectively,[1] by failing to comply with their own

---

**1.** Sections 6(b)(1) and (5), 15 U.S.C. §§ 78f(b)(1) and (5), as amended, state:

(b) An exchange shall not be registered as a national securities exchange unless the Commission determines that—

(1) Such exchange is so organized and has the capacity to be able to carry out the purposes of this chapter and to comply, and (subject to any rule or order of the Commission pursuant to section 78q(d) or 78s(g)(2) of this title) to enforce compliance by its members and persons associated with its members, with the provisions of this chapter, the rules and regulations thereunder, and the rules of the exchange.

(5) The rules of the exchange are designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, to foster cooperation and coordination with persons engaged in regulating, clearing, settling, processing information with respect to, and facilitating transactions in securities, to remove impediments to and perfect the mechanism of a free and open market and a national market system, and, in general, to protect investors and the public interest; and are not designed to permit unfair discrimination between customers, issuers, brokers, or dealers, or to regulate by

rules. The district court, in an opinion reported at 633 F.Supp. 1254 (1986), dismissed the complaint, concluding that Brawer lacked a private right of action. OCC and AMEX, in a joint brief, argue that the district court should be affirmed either on the ground stated in its opinion or on the alternative ground that Brawer failed to allege fraud or bad faith in his complaint. The Securities and Exchange Commission (SEC) also submits an amicus brief which urges affirmance on the latter ground. Agreeing with this position, we affirm and hold that a private cause of

action against an exchange or a clearinghouse for failure to comply with one of its rules which requires an exercise of discretion, if one exists at all, may be brought only if it is premised upon allegations of fraud or bad faith.[2]

Brawer alleges the following: AMEX, a national securities exchange registered pursuant to § 6 of the Act, 15 U.S.C. § 78f, maintains a market for trading in stocks, bonds and options. All options listed on AMEX are cleared through OCC, a clearing agency registered under § 17A, 15 U.S.C. § 78q–1. Both AMEX and OCC are self-

---

virtue of any authority conferred by this chapter matters not related to the purposes of this chapter or the administration of the exchange.

In relevant part, §§ 17A(b)(3)(A), (F), and (G), 15 U.S.C. §§ 78q–1(b)(3)(A), (F), and (G) provide:

(3) A clearing agency shall not be registered unless the Commission determines that—

(A) Such clearing agency is so organized and has the capacity to be able to facilitate the prompt and accurate clearance and settlement of securities transactions for which it is responsible, to safeguard securities and funds in its custody or control or for which it is responsible, to comply with the provisions of this chapter and the rules and regulations thereunder, to enforce (subject to any rule or order of the Commission pursuant to section 78q(d) or 78s(g)(2) of this title) compliance by its participants with the rules of the clearing agency, and to carry out the purposes of this section.

(F) The rules of the clearing agency are designed to promote the prompt and accurate clearance and settlement of securities transactions, to assure the safeguarding of securities and funds which are in the custody or control of the clearing agency or for which it is responsible, to foster cooperation and coordination with persons engaged in the clearance and settlement of securities transactions, to remove impediments to and perfect the mechanism of a national system for the prompt and accurate clearance and settlement of securities transactions, and, in general, to protect investors and the public interest; and are not designed to permit unfair discrimination in the admission of participants or among participants in the use of the clearing agency, or to regulate by virtue of any authority conferred by this chapter matters not related to the purposes of this section or the administration of the clearing agency.

(G) The rules of the clearing agency provide that (subject to any rule or order of the Commission pursuant to section 78q(d) or 78s(q)(2) of this title) its participants shall be

appropriately disciplined for violation of any provision of the rules of the clearing agency by expulsion, suspension, limitation of activities, functions, and operations, fine, censure, or any other fitting sanction.

The introductory paragraph of § 19(g)(1) of the Securities Exchange Act of 1934, 15 U.S.C. § 78s(g)(1), in relevant part, provides:

Every self-regulatory organization shall comply with the provisions of this chapter, the rules and regulations thereunder, and its own rules....

2. Accordingly, we express no opinion on two issues argued by the parties on appeal. First, whether *Baird v. Franklin*, 141 F.2d 238 (2d Cir.), *cert. denied*, 323 U.S. 737, 65 S.Ct. 38, 89 L.Ed. 591 (1944), remains good law after the 1975 Amendments to the Act and recent Supreme Court decisions. *Compare Brawer v. Options Clearing Corp.*, 633 F.Supp. 1254 (S.D.N.Y. 1986) (*Baird* no longer remains good law), *with Rich v. New York Stock Exchange*, 509 F.Supp. 87 (E.D.N.Y.1981) (holding that recent Supreme Court decisions do not eliminate the private cause of action established in *Baird* and arguing that the Congressional silence regarding *Baird* in the 1975 Amendments indicates approval of the then-existing private cause of action under § 6). Second, whether *Baird v. Franklin* may be extended after the 1975 Amendments to support a private cause of action for an SRO's failure to comply with its own rules. *Compare Brawer*, 633 F.Supp. at 1257 n. 5 (no significant distinction between the facts of *Baird* and a case where an investor claims that an SRO failed to comply with its own rules) *and Bright v. Philadelphia-Baltimore-Washington Stock Exchange*, 327 F. Supp. 495 (E.D.Pa.1971) (member stated cause of action against exchange by claiming that exchange had intentionally violated the election provisions of its constitution), *with Lenowitz v. Philadelphia Stock Exchange, Inc.*, 502 F.Supp. 428 (E.D.Pa.1980) (finding *Bright* no longer persuasive in light of the evolution of the law since that decision).

regulatory organizations (SROs) as defined by § 3(a)(26) of the Act, 15 U.S.C. § 78c(a)(26). Phillips Petroleum Company (Phillips), whose stock trades exclusively on the New York Stock Exchange, lists its options on AMEX. Brawer sold—in securities parlance "wrote" or took a "short" position in—a number of puts in Phillips stock which were outstanding on March 1, 1985.

A "put option" obligates the seller (writer) to buy shares of the underlying security at a stated price (exercise price), if the buyer (holder) decides to exercise the option prior to its expiration date. Generally, one purchases a put option as insurance. A put option establishes a floor at which the holder will always be able to sell the underlying security; if the price drops below the option's stated exercise price, the holder will be able to invoke the option and sell the securities. On the other side, the option writer essentially takes on the downside risk in exchange for the price of the option. Therefore, if the price of the underlying security falls precipitously, as apparently happened to Phillips stock in this case, the writer may suffer a significant loss.

In December, 1984, a Texas partnership led by T. Boone Pickens, Jr. announced an unsolicited tender offer for Phillips stock. As a defensive tactic, Phillips' board of directors proposed a plan which included the exchange of its own debt securities for 38 per cent of its common stock, the sale of 32 million newly issued shares of common stock to an employee stock ownership plan, and the purchase of the Texas partnership's stock in Phillips at a premium. The price of Phillips stock fell substantially upon the announcement of the plan. The plan did not become effective, however, because it failed to receive the requisite number of votes at a special meeting of Phillips shareholders.

Shortly after this plan was proposed, another hostile bidder for Phillips emerged, led by Carl Icahn of New York. Between the close of business on Friday, March 1, and the opening of trading on Monday, March 4, Phillips fashioned and announced a second financing scheme. Under this second plan, Phillips would issue a package of debt securities for half of its outstanding common stock. In its offer to purchase, Phillips noted that the likely effect of its offer would be to drive down the price of its common stock. The second hostile bidder withdrew its tender offer in response to this plan.

Both AMEX and OCC have procedures for adjusting option prices in response to changes in the market for an underlying security. AMEX rules 902 and 903 [3] make options being traded on AMEX subject to adjustment in accordance with OCC rules. Article VI, Section 11(d) of OCC's Bylaws [4]

---

**3.** Amex Rules 902(a) and 903(c) and (d) provide:
Rule 902.
(a) Subject to the provisions of Rules 905, 907 and 909, the rights and obligations of holders and writers of option contracts of any class of options dealt in on the Exchange shall be as set forth in the rules of the Options Clearing Corporation.
Rule 903. * * *
(c) The unit of trading and the exercise price initially established for option contracts of a particular series are subject to adjustment in accordance with the rules of the Options Clearing Corporation. When such adjustment or adjustments have been determined, announcement thereof shall be made by the Exchange and, effective as of the time specified in such announcement, the adjusted unit of trading and the adjusted exercise price shall be applicable with respect to all subsequent transactions in such series of options.

(d) Option contracts shall be subject to adjustments in accordance with the rules of the Options Clearing Corporation.

**4.** OCC By-laws, Article VI, § 11(d) states:
In the case of any reorganization, recapitalization, reclassification or similar event with respect to shares of underlying securities for which adjustment is not provided in any of the foregoing paragraphs of this Section 11, or in the case of any event for which adjustment is provided in one of the foregoing paragraphs but is not considered by the Securities Committee to be appropriate under the circumstances, the Securities Committee shall make such adjustments in the exercise price, trading unit or number of contracts with respect to the option contracts affected by such event as that Committee in its sole discretion determines to be fair to the holders and writers of such option contracts.

provides that in the case of a "reorganization, recapitalization, reclassification or similar event" affecting the underlying security, "the Securities Committee shall make such adjustments in the exercise price, trading unit or number of contracts ... as that Committee in its sole discretion determines to be fair to the holders and writers of such option contracts."

Although OCC and AMEX had indicated that they would adjust if the first plan became effective, they made no adjustment in response to the second plan. Nor did they halt trading after the announcement of the second financing plan. When trading opened on Monday, March 4, 1985, the prices of Phillips options rose immediately and steeply as the market responded to expectations of a decline in Phillips stock after the plan was implemented. During the following week, OCC and AMEX received numerous telephone calls asking whether they would adjust Phillips options prices in response to the second financing plan. Both OCC and AMEX indicated that no adjustments were likely. The OCC Securities Committee, consisting of two officers of AMEX and the chairman of OCC, held a telephone meeting on Thursday, March 7, 1985, at 3:30 in the afternoon, to discuss the question. They decided that the transaction should be classified as an exchange offer,[5] and, in accordance with longstanding policy, decided not to adjust prices in response. This decision was announced prior to trading on Friday, March 8. Brawer alleges that the Securities Committee took this action because they believed that unadjusted Phillips options would be more useful as instruments of arbitrage, thereby increasing the trading volumes and revenues of the exchanges.

In an effort to recover his losses, Brawer commenced this action on behalf of himself and all other writers of Phillips puts who had options outstanding on March 1, 1985. OCC and AMEX moved to dismiss the complaint on two grounds. First, they claimed that the Act does not create a private cause of action for the failure of an exchange or a clearing house to comply with its own rules. Second, they argued that, even if a cause of action existed, a claim that OCC and AMEX failed to comply with their respective adjustment rules could stand only if the complaint alleged bad faith or fraud. The district court granted the motion on the first ground and dismissed the complaint, concluding that the Supreme Court's recent reluctance to imply causes of action under federal statutes, combined with the changes made by the 1975 Amendments to the Act, had undermined *Baird v. Franklin*, 141 F.2d 238 (2d Cir.), *cert. denied*, 323 U.S. 737, 65 S.Ct. 38, 89 L.Ed. 591 (1944), and eliminated the private right of action for violations of these three sections.[6] Consequently, it did not consider defend-

---

**5.** The parties disagree as to whether the second financing scheme should be designated a "recapitalization" or an "exchange offer." Under the view we take, we need not consider this disagreement.

**6.** *Baird* held only that an investor had a cause of action against an exchange for its failure to enforce compliance by a member with the Act or the exchange's rules under § 6, as it existed prior to the 1975 Amendments. That section provided in relevant part:

(b) No registration shall be granted or remain in force unless the rules of the exchange include provision for the expulsion, suspension, or disciplining of a member for conduct or proceeding inconsistent with just and equitable principles of trade, and declare that the willful violation of any provisions of this title or any rule or regulation thereunder shall be considered conduct or proceeding incon-

sistent with just and equitable principles of trade.

(d) If it appears to the Commission that the exchange applying for registration is so organized as to be able to comply with the provisions of this title and the rules and regulations thereunder and that the rules of the exchange are just and adequate to insure fair dealing and to protect investors, the Commission shall cause such exchange to be registered as a national securities exchange.

The district court noted that in this case no member was involved and that Brawer had only alleged that AMEX and OCC had failed to comply with their own rules. However, it concluded that "[t]he distinction does not appear to be significant to the determination whether there is a private right of action under § 6 against an exchange." 633 F.Supp. at 1257 n. 5. We express no opinion as to this conclusion. *See* note 2, *supra.*

ants' second argument. We affirm because Brawer failed adequately to allege fraud or bad faith.

■ Brawer asks us to reaffirm the private cause of action established in *Baird* for the failure of an exchange to enforce its rules as required by pre–1975 Amendments § 6, and to extend it to include a cause of action for the failure of an exchange to comply with its own rules under §§ 6, 17A, and 19, as amended. However, here the action involved was discretionary. Courts have consistently held that "absent allegations of bad faith [an exchange and its officials] may not be held for discretionary actions taken in the discharge of their duties pursuant to the rules and regulations of the Exchange." *P.J. Taggares Co. v. New York Mercantile Exchange*, 476 F.Supp. 72, 76 (S.D.N.Y.1979). We recently reaffirmed this view in *Sam Wong & Son, Inc. v. New York Mercantile Exchange*, 735 F.2d 653, 670 (2d Cir.1984) ("That bad faith is the standard of liability for suits against an exchange with respect to its taking action authorized by applicable law has been established at least since *Daniel v. Board of Trade*, 164 F.2d 815 (7 Cir.1947)...."). That these decisions involved suits under the Commodity Exchange Act, 7 U.S.C. § 1 *et seq.*, makes no difference. The bad faith standard expressly established by Congress for Commodity Exchange Act cases in a 1982 amendment, 7 U.S.C. § 25(b)(4), merely codified existing case law under that statute, 735 F.2d at 676 n. 30.[7] Moreover, courts have applied the bad faith standard in suits alleging violations of discretionary rules by the securities exchanges as well. *See, e.g., Schonholtz v. American Stock Exchange, Inc.*, 376 F.Supp. 1089, 1092 (S.D.N.Y.) (dismissing complaint because allegations of exchange rule violations were not coupled with claims of fraud), *aff'd*, 505 F.2d 699

(2d Cir.1974) (per curiam) and cases cited therein. *But cf. Rich v. New York Stock Exchange*, 522 F.2d 153, 155 n. 4 (2d Cir. 1975) (noting that the courts apply a negligence standard to claims that an exchange failed to supervise adequately its members).

There are good reasons why a negligence standard has not been and should not be applied to SRO decisionmaking.[8] First, applying a negligence standard in such cases would force a court to substitute its judgment for that of the experts on the exchange. *See Aronson v. McCormick*, 13 Misc.2d 1077, 178 N.Y.S.2d 957, 959 (Sup. Ct.), *aff'd mem.*, 6 A.D.2d 999, 177 N.Y. S.2d 1004 (1958). In doing so, a court would be aided neither by specific statutory standards nor by any particular financial expertise, *cf. Auerbach v. Bennett*, 419 N.Y.S.2d 920, 926, 47 N.Y.2d 619, 630, 393 N.E.2d 994, 1000 (1979). Moreover, after-the-fact litigation would be a "most imperfect device" with which to evaluate SRO decisions. *Cf. Joy v. North*, 692 F.2d 880, 886 (2d Cir.1982), *cert. denied*, 460 U.S. 1051, 103 S.Ct. 1498, 75 L.Ed.2d 930 (1983).

Second, such an intrusion would conflict with the Congressional scheme of exchange self-regulation. As the Supreme Court recognized in *Silver v. New York Stock Exchange*, 373 U.S. 341, 352, 83 S.Ct. 1246, 1254, 10 L.Ed.2d 389 (1963), quoting Justice Douglas during his tenure as Chairman of the SEC, the intention of the Act was "one of 'letting the exchanges take the leadership with Government playing a residual role. Government would keep the shotgun, so to speak, behind the door, loaded, well oiled, cleaned, ready for use but with the hope it would never have to be used.'" A negligence standard would bring the government's "shotgun" into almost everyday use.

---

7. Although *Sam Wong* was decided after Congress amended the Commodity Exchange Act to include an express bad faith standard, the claim being considered in *Sam Wong* arose before the amendment. The court used the amendment as evidence of what Congress believed that the

statute required prior to its amendment. 735 F.2d at 676 n. 30.

8. Here, the relevant by-laws obviously gave AMEX and OCC great discretion. Under a different rule, a different sort of duty might obtain. *See Baird*, 141 F.2d at 244.

Third, this governmental intrusion, particularly if it did not employ statutory standards of review, would only serve to increase market uncertainty. Every decision made by a SRO would be subject to litigation and judicial review because "any decision the Committee makes will benefit one group of option investors at the expense of another." 633 F.Supp. at 1261–62. The resulting uncertainty benefits no one. *See, e.g.,* J. Pappas & E. Brigham, *Managerial Economics,* 82–86 (3d ed. 1979). As the SEC pointed out in its amicus brief, "[w]hat is essential in such a situation, for the benefit of all investors, is that the decision be made fairly and considered final."

■ Brawer's argument that OCC's adjustment rule is not discretionary need not detain us long. Although the rule employs the imperative "shall", it also vests the decision as to what adjustments should be made "in the sole discretion" of the Securities Committee. OCC and AMEX read the rule as allowing the Securities Committee discretion whether to make any adjustments at all. We agree. *See, e.g., Fogel v. Chestnutt,* 533 F.2d 731, 753 (2d Cir.1975) ("an exchange has a substantial degree of power to interpret its own rules"), *cert. denied,* 429 U.S. 824, 97 S.Ct. 77, 50 L.Ed.2d 86 (1976); *Intercontinental Industries, Inc. v. American Stock Exchange,* 452 F.2d 935, 940 (5th Cir.1971) ("Since these are the rules of the Exchange, it should be allowed broad discretion in the determination of their meaning and application."), *cert. denied,* 409 U.S. 842, 93 S.Ct. 41, 34 L.Ed.2d 81 (1972).

■ In his complaint, Brawer alleges that the Securities Committee decided not to adjust because unadjusted options were more efficient as instruments of arbitrage and therefore generate increased trading volumes and revenues. Even if Brawer's claim is true, and OCC and AMEX disagree with the factual premise, he has not made

out a sufficient claim of bad faith. As we recently recognized in denying a similar claim of bad faith as too remote and speculative, "[i]f such a degree of self-interest were allowed to demonstrate bad faith, then exchange board members ... would inevitably be subject to bad-faith charges, and the concept of exchange self-regulation would be undermined." *Sam Wong,* 735 F.2d at 672 (quoting, *Jordon v. N.Y. Mercantile Exchange,* 571 F.Supp. 1530, 1545 (S.D.N.Y.1983)). Nor do we give any weight to Brawer's argument that bad faith may be found because there was no significant distinction between the first Phillips financing scheme, which apparently would have prompted OCC and AMEX to adjust option prices, and the second financing scheme, which resulted in no action by OCC and AMEX. The Securities Committee found that the two financing schemes were sufficiently different to justify different treatment. We decline to substitute our judgment for theirs.[9]

■ More troublesome is Brawer's claim that OCC and AMEX sterilized their discretion by waiting over three trading days before meeting to decide whether to adjust. This delay was compounded by the allegation that OCC and AMEX staff members had been stating as early as Monday, March 4 that no adjustment would be made. Brawer claims that by the time the Securities Committee met, they could make no other decision than not to adjust. However, some of that time was apparently spent marshalling information about the second financing scheme. Without this information the Securities Committee would have been subject to a claim of bad faith for failing to be adequately informed.[10] Thus, we are reluctant to require such a Committee to make a "snap" decision. While the issue is close, we think that the mere failure to hold a meeting until three

9. We do not mean to foreclose the possibility that disparate treatment of essentially identical financing schemes might be so arbitrary as to constitute constructive bad faith. However, in this case, Brawer has not alleged a sufficient identity between the two plans to induce us to

second-guess the Securities Committee's conclusion.

10. Indeed, Brawer makes just such a claim in the instant case.

days after the announcement of the second financing scheme does not, without more, amount to a claim of bad faith.

Affirmed.