MINPECO, S.A., Plaintiff,

v.

Nelson Bunker HUNT, Lamar Hunt, William Herbert Hunt, International Metals Investment Co., Ltd., Sheik Mohammed Aboud Al–Amoudi, Sheik Ali Bin Mussalem, Naji Robert Nahas, Gilion Financial, Inc., Advicorp Advisory and Financial Corporation, S.A., and Mahmoud Fustok, Defendants.

Ronald GORDON, Plaintiff,

v.

Nelson Bunker HUNT, William Herbert Hunt, Lamar Hunt, International Metals Investment Co., Ltd., Sheik Mohammet Aboud Al–Amoudi, Sheik Ali Bin Mussalem, Faisal Ben Abdullah Al Saoud, Mahmoud Fustok, Naji Robert Nahas, Bache Halsey Stuart Shields, Inc., Bache Group, Inc., Merrill Lynch, Pierce Fenner & Smith, Inc., Conticommodity Services, Inc., Conti–Capital Management, Inc., Conti–Capital Ltd., Norton Waltuch, Melvin Schnell, Gilion Financial, Inc., Banque Populaire Suisse, Advicorp Advisory and Financial Corporation, S.A., Commodity Exchange, Inc., the Board of Trade of the City of Chicago, ACLI International Commodity Services, Inc., Litardex Traders, S.A., and John Does Nos. 1 through 15, Defendants.

Philip and Dorothy KORWEK, Marty Finkelstein, William L. Cohn and James G. Williams, Plaintiffs,

v.

Nelson Bunker HUNT, William Herbert Hunt, Lamar Hunt, International Metals Co., Ltd., Sheik Mohammet Aboud Al–Amoudi, Sheik Ali Bin Mussalem, Faisal Ben Abdullah Al Saoud, Mahmoud Fustok, Naji Robert Nahas, Bache Halsey Stuart Shields, Inc., Bache Group, Inc., (Prudential Bache Securities, Inc.), Merrill Lynch, Pierce Fenner & Smith, Inc., Conticommodity Services, Inc., Conti–Capital Ltd., Norton Waltuch, Melvin Schnell, Gilion Financial, Inc., Banque Populaire Suisse, Advicorp Advisory and Financial Corporation, S.A., Commodity Exchange,

Inc., the Board of Trade of the City of Chicago, Donaldson, Lufkin & Jenrette ACLI Futures, Inc., formerly, ACLI International Commodity Services, Inc., Litardex Traders, S.A., Walter Goldschmidt, Continental Grain Co., Defendants.

Nos. 81 Civ. 7619 (MEL), 82 Civ. 1318 (MEL) and 84 Civ. 7934 (MEL).

United States District Court,
S.D. New York.

Aug. 25, 1988.

See also 673 F.Supp. 684.

Cole & Corette, Washington, D.C., for plaintiff Minpeco, S.A.; Mark A. Cymrot, Thomas O. Gorman, Scott Andersen, Kathy Milton, Grand & Ostrow, New York City, of counsel.

Deutsch & Frey, New York City, for plaintiffs Gordon & Korwek Class; Herbert I. Deutsch, of counsel.

Baer Marks & Upham, New York City, for defendant Commodity Exchange, Inc.; Barry J. Mandel, Thomas E. Albright, Richard Kelly, of counsel.

LASKER, District Judge.

The motion of defendant Commodity Exchange, Inc. ("Comex") for summary judgment in these actions was granted orally on the record on November 6, 1987.[1] This

---

1. Familiarity with the facts and issues in these actions and with the basic terminology of commodity futures trading is assumed.

opinion sets forth the grounds for the decision to grant summary judgment.

The following facts are not in dispute. For over fifty years, Comex has served as a commodity exchange on which its members may enter into contracts to make or take future delivery of certain commodities. Comex has been designated by the Commodity Futures Trading Commission as a "contract market" for the trading of silver futures contracts, pursuant to 7 U.S. C. § 7. One of the conditions of this designation is that Comex's governing board must "provide[ ] for the prevention of manipulation of prices and the cornering of any commodity by the dealers or operators upon such board," 7 U.S.C. § 7(d).

In 1979–1980, the Comex Board of Governors was composed of twenty-four members. The Board members represented, and were organized into, four groups: the trade group, whose seven members were affiliated with companies engaged in the metals business; the floor group, whose seven members were floor brokers and/or floor traders on the exchange; the commission house group, whose seven members were affiliated with futures commission merchants; and the general group, with three members, two of whom were public members of the Board unaffiliated with the commodities industry and one of whom was a self-employed commodity trading advisor.[2]

From August through September 1979 the per-ounce price of silver, which had been stable at the six dollar level from 1974 to 1978, rose from nine to eighteen dollars. By December 1979, silver reached twenty-five dollars per ounce, and in mid-January, the price of silver peaked at about fifty dollars per ounce. During this period, which amounted to a crisis in the view of many market participants, concern was expressed that the silver futures market was becoming congested and that a possible manipulation of silver prices might be in progress.

In response to these unusual events in the silver market, the Comex Board of Governors convened for at least twenty-five special or emergency meetings in addition to its regular monthly board meetings. Among the actions that the Comex Board took were the following: On October 4, 1979, the Board voted unanimously to appoint "disinterested" members of the Board to serve on a Special Silver Committee to "deal with the silver situation" and to "take all action with respect to the silver market that could otherwise be taken by the Board."[3] The Special Silver Committee consisted of Dr. Andrew F. Brimmer, a public member, who chaired the Committee, and three additional members representing each of the three other groups which comprised the Board. The Special Silver Committee held at least nine formal meetings during this period and also conducted depositions, surveys and negotiations with market participants.[4]

Next, the Board, in conjunction with the Special Silver Committee, began to raise periodically the margin requirements for silver futures contracts and engaged in "jawboning" with market participants holding long silver futures positions to attempt to achieve voluntary position reductions. On January 7, 1980, the Board imposed position limits on holders of silver futures contracts. Two members abstained from the vote; all other members present voted in favor of the limits.[5] On January 21, 1980, the Board imposed liquidation-only trading on the silver market: no new contracts could be bought and the only trading permitted was the liquidation of existing contracts. Of the governors present, ten

---

2. *See* Appendix, Table I, for a listing of all twenty-four members and their affiliations.

3. Exhibits to Plaintiffs' Memorandum in Opposition to Comex's Motion for Summary Judgment Section I ("PX") at 11. On October 3, 1987, the Board had taken an initial vote to appoint a Special Silver Committee. Eleven members voted in favor, two voted against, and three abstained. PX 10. Apparently because additional affirmative votes were technically required to appoint the committee, the vote was repeated the next day.

4. *See* PX 1–45.

5. PX 39.

voted in favor of the liquidation-only rule and five abstained.[6]

By the beginning of March 1980, the price of silver had dropped to thirty-five dollars per ounce. By the end of March 1980 silver plummeted further, dropping to as low as ten dollars per ounce.

■ Plaintiffs claim that the rise in silver price from September 1979 to January 1980 was the result of a conspiracy by market participants who held long positions in silver future contracts. They allege that these higher silver prices "further[ed] the financial interests of [Comex] and [its] members," and claim that, as a result, Comex breached its duties under 7 U.S.C. § 7(d) and 7a(8) to prevent the manipulation of commodity prices and the cornering of commodities by failing:

> negligently, willfully or in bad faith to take effective action to control rapidly rising silver prices even though [it] knew or recklessly ignored the fact that these prices were not the result of natural market forces, but were being caused by the unlawful scheme and conspiracy of the other defendants.[7]

The voluminous exhibits and affidavits submitted by both Comex and plaintiffs in connection with this motion, the fruits of five years of discovery, have been carefully examined, drawing all justifiable inferences in favor of plaintiffs. It is concluded, under the substantive legal standards governing plaintiffs' claim against Comex, that plaintiffs have failed to make a sufficient showing to raise a genuine issue of material fact as to whether "self-interest or other ulterior motive unrelated to proper regulatory concerns" was the "sole or dominant" reason for Comex's actions and inactions. *Sam Wong & Son, Inc. v. N.Y. Mercantile Exchange*, 735 F.2d 653, 677 (2d Cir.1984). Because there is insufficient evidence of

record to allow a reasonable jury to find for plaintiffs on this claim, the motion for summary judgment under Fed.R.Civ.P. 56 is granted. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–252, 106 S.Ct. 2505, 2509–2512, 91 L.Ed.2d 202 (1986).

## DISCUSSION

The Court of Appeals for this circuit has clearly established that commodity exchanges may only be held liable under the Commodity Exchange Act for actions that are taken or withheld in bad faith: "self-interest or other ulterior motive unrelated to proper regulatory concerns" must "constitute the sole or dominant reason for the exchange action" or inaction. *Sam Wong & Son, Inc. v. N.Y. Mercantile Exchange*, 735 F.2d 653, 677 (2d Cir.1984); *accord, Apex Oil Co. v. DiMauro*, 822 F.2d 246, 261 (2d Cir.), *cert. denied*, —— U.S. ——, 108 S.Ct. 489, 98 L.Ed.2d 487 (1987); *Brawer v. Options Clearing Corp.*, 807 F.2d 297, 302 (2d Cir.1986); *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc.*, 748 F.2d 774, 780 (2d Cir. 1984).[8] Hence, to succeed on a claim of bad faith plaintiffs must establish "first, that the exchange acted or failed to act with knowledge[ ] and second, that the exchange's action or inaction was the result of an ulterior motive." *Ryder Energy*, 748 F.2d at 780.

■ The heightened standard of proof required to prevail on a claim against a commodity exchange arises from several factors. First, under the self-regulatory scheme established by Congress with the enactment of the Commodity Exchange Act, commodity exchanges are accorded "broad and flexible powers [to] enable them to insure an orderly market and prevent manipulation in prices...." *Case & Co. v. Board of Trade of the City of Chica-*

---

6. PX 43–44.

7. *Minpeco S.A. v. Conticommodity Services Inc.*, 81 Civ. 7619, Fourth Amended Complaint (June 17, 1985) at ¶¶ 245, 243; *see also Gordon v. Hunt*, 82 Civ. 1318, Amended Complaint (Dec. 22, 1982) at ¶¶ 154–157; *Korwek v. Hunt*, 84 Civ. 7934, First Amended Complaint (Feb. 21, 1985) at ¶¶ 153–156.

8. In enacting the Futures Trading Act of 1982, Congress specifically amended the Commodity Exchange Act to provide prospectively that private litigants bringing actions against an exchange must establish that "the contract market ... acted in bad faith in failing to take action or in taking such action as was taken...." 7 U.S.C. § 25(b)(4).

*go,* 523 F.2d 355, 362 (7th Cir.1975); *accord, Miller v. New York Produce Exchange,* 550 F.2d 762, 767 (2d Cir.1977); *P.J. Taggares Co. v. New York Mercantile Exchange,* 476 F.Supp. 72, 75–76 (S.D.N.Y. 1979). To apply a lesser, negligence-based standard in a claim against an exchange "would conflict with the Congressional scheme of exchange self-regulation" and would "force a court to substitute its judgment for that of experts on the exchange," aided "neither by specific statutory standards nor by any particular financial expertise." *Brawer,* 807 F.2d at 302.

■ Second, bad faith must be established as the "sole or dominant" reason for the exchange action or inaction because of the possibility, inherent in the scheme of exchange self-regulation, that exchange directors may simultaneously "act[ ] to advance the public interest, as well as to advance their own interests." *Bishop v. Commodity Exchange, Inc.,* 564 F.Supp. 1557, 1562 (S.D.N.Y.1983). As this court has recognized,

> the Comex Board is composed of members of the commodities industry, who are called upon, on occasion, to vote on matters which, by the nature of the situation, relate to the industry from which a Governor derives his livelihood. A vote on such questions will then quite likely affect his interests as well as the public's. Should a Governor vote in favor of such a rule in the belief that the rule served the public interest, even if also in the expectation and hope that it would serve his personal interest, his behavior would not give rise to liability.

*Id.* In sum, the requirement of bad faith as a sole or dominant motive balances:

the competing needs of exchanges and their officials and of the trading public. Although governors must be able to police the markets effectively with the broad discretion accorded by Congress, traders must not be deprived of their right to challenge illegitimate regulatory action. The Commodity Exchange Act, which embodies the statutory model of exchange self-regulation, mandates that we strike a balance that does not insulate exchange officials from answering serious questions posed by injured traders. To do otherwise would drastically curtail the private right of action deemed essential to the regulatory framework established by Congress.... On the other hand, if the governors sincerely and rationally believe their action is in the public interest, there should not be liability simply because the action has the incidental effect of advancing their private interests or damaging someone whom they do not like.

*Sam Wong,* 735 F.2d at 677.

Here, plaintiffs argue that they have made a showing of bad faith sufficient to defeat this summary judgment motion based on two theories.[9] First, plaintiffs contend that Comex's failure to control the silver market "reflects a complete and total abdication of responsibilities for no apparent rational reason,"[10] from which bad faith can be inferred. Second, plaintiffs argue that there is evidence of record supporting the inference that self-interest— specifically the expectation of either personal or corporate financial gain—was the substantial motivating factor of Comex's actions and inaction. These theories will be examined in turn.[11]

---

9. Plaintiffs argue at length that evidence of record indicates that Comex knew or should have known that the markets were congested and manipulated. Because it is concluded that plaintiffs have failed to demonstrate a genuine issue of material fact as to whether Comex's "action or inaction was the result of an ulterior motive," it is unnecessary to reach the issue whether plaintiffs have made a sufficient showing that Comex "acted or failed to act with knowledge." *Ryder Energy,* 748 F.2d at 480. It is noted, however, that plaintiffs' claim that Comex "knew the [silver market] and knew it was being manipulated," Plaintiffs' Memoran-

dum in Opposition to Comex's Motion for Summary Judgment ("Plaintiffs' Memorandum") (September 14, 1987) at 60, is difficult to square with their allegations that other defendants deliberately withheld material information from Comex in order to conceal the alleged conspiracy.

10. Plaintiffs' Memorandum at 73.

11. Plaintiffs also posit that they have made a sufficient showing of bad faith under what they describe as the "objective test" under which

1. *Irrationality:* The *Sam Wong* court noted that "[a]bsent some basis in reason," defined as "only a minimal requirement ... not a showing that the emergency action constituted the optimal response," an exchange's actions "could hardly be in good faith even apart from ulterior motive." 735 F.2d at 678 n. 32. *See also Brawer,* 807 F.2d at 303 n. 9 ("We do not mean to foreclose the possibility that [exchange actions] might be so arbitrary as to constitute constructive bad faith."); *Jordon,* 571 F.Supp. at 1553 (indicating the possibility that irrational exchange action might independently support inference of bad faith); *Apex Oil Co. v. DiMauro,* 641 F.Supp. 1246, 1280 (S.D.N.Y.1986) (rejecting contention that exchange acted irrationally), *aff'd in relevant part and rev'd in part,* 822 F.2d 246 (2d Cir.1987), *cert. denied,* — U.S. ——, 108 S.Ct. 489, 98 L.Ed.2d 487 (1987).

Here, in hindsight it might be argued that Comex may have relied too heavily and too long on a policy of mediation or "jawboning," and might have affected better control over the silver market by impos-

ing position limits earlier, as did the Chicago Board of Trade. There is insufficient evidence of record, however, to support a finding that Comex's actions or inaction from the period in question constituted "the kind of reckless and virtually irrational exchange action that might independently support an inference of bad faith." *Jordon,* 571 F.Supp. at 1553. The record indicates, to the contrary, that Comex's course of action, determined in an intensive series of special board meetings over a period of several months in conjunction with consultation from the CFTC, was within the broad discretion accorded to it under the Commodity Exchange Act.

This conclusion is supported by the results of an extensive investigation undertaken by the CFTC. In June 1985 the CFTC Division of Trading and Markets issued a 716 page report entitled *The Silver Market of 1979/1980* ("June 1985 Report"), PX 142, concerning the propriety of the actions of the Chicago Board of Trade and Comex during the crisis in the silver market.[12] The June 1985 Report posed the following question:

---

"bad faith is based on clear violation of a statutory duty." Plaintiffs' Memorandum at 81. Plaintiffs cite to a passage in *Jordon v. New York Mercantile Exchange,* 571 F.Supp. 1530, 1548 (S.D.N.Y.1983), *aff'd in part and rev'd in part sub nom. Sam Wong & Son v. N.Y. Mercantile Exchange,* 735 F.2d 653 (2d Cir.1984), in which the district court stated that

the existence of bad faith must be tested by an objective standard, rather than a subjective standard that would permit trial on the issue of board members' state of mind virtually without regard for the insubstantiality of the objective, circumstantial evidence of ulterior motive.

This language and the accompanying citation to *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), however, read in context, merely amplify the court's earlier warning that "[t]he bad faith standard can be satisfied only by substantial evidence supporting more than mere suspicion or speculation about a Board's ulterior motives ...," *id.* In sum, the passage quoted from *Jordon* emphasizes the difficulty of establishing bad faith and certainly does not establish an independent test for determining bad faith.

**12.** Plaintiffs correctly note that the initial impetus for the investigation leading to this report were allegations of "short side" violations on the part of the contract markets: that exchange

governors who held or were affiliated with holders of short silver futures contracts voted to impose position limits and liquidation-only trading because lower silver prices would benefit their financial interests. However, it is also clear from the eventual scope of the investigation and the final report that the Division of Trading and Markets also specifically recognized, investigated and reached conclusions as to the allegations that the exchange boards "rather than acting too strongly, did not act strongly enough" and

failed to take early and decisive steps to prevent the ensuing severe turbulence in silver prices, based on any one of several possible motives alleged to be improper: (i) hesitancy to close down or severely curtail silver trading, which provides income to the exchanges and member firms trading for public customers, (ii) protection of "tax trading", or (iii) collusion with long traders holding dominant positions.

PX 142 at 7. Parenthetically, that the exchange boards have been criticized and sued both by longs for favoring shorts and by shorts for favoring longs highlights their legal vulnerability and the need for the heightened bad faith standard.

Did the governing boards of the Comex and CBT adequately identify and address the potential market threat posed by volatile silver prices and the appearance of large silver position concentrations during this period, in line with their responsibilities to the public as federally-designated self-regulatory organizations? [13]

The Report concluded that

[a]lthough the [CFTC] staff, with the benefit of hindsight, [might] have applied the remedies chosen by the exchanges differently in addressing the developing market problem, each response—negotiations with long traders, margin adjustments, position limits, and liquidation only trading—was within the appropriate range of discretion accorded to exchanges under applicable statutes and CFTC Regulations to protect the public interest during market emergencies. [14]

Specific to Comex, the June 1985 Report criticized Comex's over-reliance on jawboning:

In retrospect, COMEX was probably ill-advised in not abandoning the negotiation process and turning to mandatory exchange measures earlier, as had the Chicago Board of Trade. The [voluntary] accords had little overall impact on position limits until a late stage, and may have lessened the exchange's credibility in enforcing the position limits rule ultimately adopted. [15]

Despite this analysis, admittedly reached "with the benefit of 20/20 hindsight," [16] the Report still concluded that

COMEX's approach ... clearly did not lack a reasonable basis. COMEX officials viewed mandatory retroactive position limits as a drastic step, and the negotiation process had been used in the past to deal with potential delivery problems and offered an opportunity to achieve the desired result of avoiding market congestion or delivery disruptions without invoking formal emergency powers. Once [it became] apparent that negotiated accords were insufficient to address the problem, and the actions of the Special Silver Committee were stymied, the Board reasserted its authority and adopted mandatory restrictions. [17]

Furthermore, it is clear from the record that the CFTC, which had the same information as Comex, if not more, about the problems facing the silver market, was in regular contact with Comex from September 1979 through March 1980 [18] and throughout that period indicated more approval than disapproval of Comex's course of action. For instance, at a meeting with Comex officials just after the adoption of position limits, Commissioner Gartner stated that Comex should be "commended" for "acting in what [he] consider[ed] to be a very responsible manner," and Chairman Stone offered a "personal compliment" that Comex and the Special Silver Committee had "acted in a particularly thoughtful way" that was "extremely encouraging for [the system of] self-regulation" of commodity exchanges. [19]

The CFTC's contemporaneous support for Comex's course of action and its after-the-fact finding that Comex's strategy had a reasonable basis are significant because of CFTC's special expertise and knowledge of commodities markets. *See In re Chicago Mercantile Exchange*, [1977–1980 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 20,436 at 21,787 (ALJ 1977), *aff'd* slip op. (CFTC 1981) (fact that exchange board "maintained communications with CEA officials throughout the period [in question]" and "the CEA administrator approved the various Board actions ... lends weight to the finding made here that the Board was acting in good faith"); *Jordon*, 571 F.Supp.

13. PX 142 at 7.

14. *Id.* at 10.

15. *Id.* at 384; *see also id.* at 356–57.

16. *Id.* at 405.

17. *Id.* at 384.

18. *Id.* at 36; Affidavit of Barry J. Mandel in Support of Motion by Commodity Exchange, Inc. for Summary Judgment, Exhibit G (Report of the Commodity Futures Trading Commission on Recent Developments in the Silver Futures Markets, May 1980) at 56–60, 65, 68, 72.

19. PX 142 at 288.

at 1554 (CFTC report finding exchange action to be reasonable "establishes that the Exchange's actions were not so reckless and irrational as to permit in themselves an inference of bad faith"); *see also Sam Wong*, 735 F.2d at 672 n. 28 (CFTC report admissible); *Miller v. New York Produce Exchange*, 550 F.2d 762, 769 (2d Cir.1977) (same); *Lagorio v. Board of Trade of the City of Chicago*, 529 F.2d 1290, 1292 (7th Cir.1976) (CFTC's "concurrence" gives "[a]dded weight" to conclusion that exchange board's emergency action was within its discretion). In sum, it is concluded, on the basis both of the CFTC June 1985 report and of an independent examination of the record, that Comex's course of action in response to the unusual events in the silver market in 1979–1980 had a reasonable basis.

2. *Ulterior Motive:* Even though the action was not beyond the bounds of reason, a plaintiff may prevail on a claim against an exchange under *Sam Wong*

> when self-interest or other ulterior motive unrelated to proper regulatory concerns ... constitute[s] the sole or the

dominant reason for the exchange action....

735 F.2d at 677. Plaintiffs' core argument on the issue of bad faith is that the Comex Board's ulterior motive in failing to take stricter measures earlier can be inferred from alleged conflicts of interest on the part of certain Comex governors.[20] Plaintiffs allege that thirteen of the twenty-four Comex governors, personally or through the business interests they represented, "had conflicts of interest relating directly to their dealings with the Hunt[ ] [defendants] or due to personal or house positions in silver" which "kept the Comex Board of Governors talking but not acting when it was legally required to act."[21] In response, twenty-one of the governors serving on the 1979–1980 Board[22] have submitted affidavits stating that the votes they cast with respect to the Comex silver futures market were made with the purpose of serving the public interest and that no ulterior motive played a part in their decisions.

Before reviewing these allegations of conflict of interest, it must be noted that the system of self-regulating exchange

**20.** Other factors listed by plaintiffs as demonstrating the Comex Board's ulterior motive either overlap substantially with the conflict of interest theory or are without merit. For instance, plaintiffs claim that bad faith can be inferred from actions taken by some of the governors' firms to "protect themselves" from the rise in the price of silver: several of the metals firms represented in the Comex Board's Trade Group withdrew from the silver market in the early fall of 1979 and several of the futures commission houses represented in the Comex Board's Commission House Group imposed liquidation-only trading on their customers to remove them from the silver market or issued warnings that the silver market was unstable. Plaintiffs, however, have failed to demonstrate sufficiently the necessary nexus between these business actions, taken by private firms in the market, and the decisions made and actions taken by the Comex Board as a public body. *Cf. Jordon*, 571 F.Supp. at 1549 (rejecting claim that bad faith could be inferred from allegation that exchange board members who were also floor brokers "took advantage of the market" through their private futures trading activity). Plaintiffs also argue that the Comex Board's ulterior motive can be inferred from the fact that the law firm of Baer Marks & Upham, outside counsel to Comex both currently and in 1979–1980, rendered legal assistance to the

Hunt defendants on silver-related issues during the period in question. In the absence of evidence that this dual representation had any impact on the Comex Board's actions, this claim is legally insufficient. *See also Minpeco S.A. v. Conticommodity Services, Inc.*, 81 Civ. 7619 (July 1, 1987) (denying plaintiffs' motion based on similar theories for disqualification of Baer Marks & Upham as Comex counsel). Finally, plaintiffs appear to have abandoned the ulterior motive theory alleged in ¶ 246(a) of Minpeco's Fourth Amended Complaint that Comex failed to carry out its statutory duties because the increased silver futures trading volume created by the alleged conspiracy served the financial interests of Comex and its members: it is undisputed that the volume of trading in silver futures contracts on Comex actually declined steadily throughout the alleged conspiracy period.

**21.** Plaintiffs' Memorandum at 4. *See also id.* at 4–5 (listing governors alleged to have conflicts of interest and describing alleged conflicts).

**22.** Two of the governors who served on the Comex Board from 1979–1980 have since died; a third did not submit an affidavit because he was absent from most of the relevant board meetings.

boards established by Congress makes it inevitable that members of exchange boards will be called upon to make decisions in their capacity as exchange officials that may have an impact on their private business interests. As this court has recognized,

> the Comex Board is composed of members of the commodities industry, who are called upon, on occasion, to vote on matters which, by the nature of the situation, relate to the industry from which a Governor derives his livelihood. A vote on such questions will then quite likely affect his interests as well as the public's.

*Bishop,* 564 F.Supp. at 1562; *see also Sam Wong,* 735 F.2d at 672 ("The concept of exchange self-regulation necessarily implies that the boards of exchanges shall contain a substantial number of persons with first-hand knowledge of the market and that these persons shall be free to share in important deliberations."); *Crowley v. Commodity Exchange,* 141 F.2d 182, 188 (2d Cir.1944) (customers doing business on an exchange must "expect to deal with those favoring either short or long interests, if not both"). Hence, in order

> to create an issue of fact concerning exchange bad faith, a plaintiff must demonstrate the existence of a conflict of interest substantially greater than that which inevitably "taints" the decisions of self-regulating exchange boards.

*Jordon,* 571 F.Supp. at 1539.

Here, the "troika" organization of the Comex Board, whereby metals firms, commission houses, and floor traders were equally represented, with the three general members representing the public at large, tends to prevent any one particular interest from dominating the Board. As the CFTC June 1985 Report describes:

> Theoretically, each Board group had its own unique perspective on the marketplace, along with its related financial interests. Commission houses carried accounts for customers and benefitted when trading volume was high and their

customers profited on their positions. Floor traders likewise had an interest in liquid markets where day trades and spreads could be transacted quickly and efficiently. Trade firms were mostly concerned that the market be an efficient forum for price hedging.

> \*    \*    \*    \*    \*    \*

As a result, the overall COMEX Board during this period could not be characterized as dominated by financial interests either long or short. Both were present in significant numbers, and their combined voting power on the Board ... still barely matched that of other Board members with either less direct or no financial interests in silver....[23]

Furthermore, the June 1985 report notes that

> [b]eyond their parochial viewpoints, ... a broad majority of the Board ... also shared long-term financial interests in maintaining Comex silver as a liquid, viable, and efficient marketplace.... These Board governors, as a matter of self-interest, were prone to oppose market manipulations or unfair or disruptive Exchange rules, to value public confidence in the market as an institution, and to protect the economic functions of futures trading in silver, hedging and price basing—so long as their perception of their own long-term interests was not eclipsed by more short-term financial motivations or opportunities.[24]

■ Finally, plaintiffs can not defeat this summary judgment motion simply by pointing to evidence of personal conflicts of interest on the part of various board members. Plaintiffs must make a showing first, that these potential conflicts actually influenced the votes of the board members, and if so, that any instances of bad faith on the part of individual members could "be deemed to taint the entire Board's actions," *Jordon,* 571 F.Supp. at 1547–48, by influencing the outcome of Board votes or otherwise swaying the Board's course of action, *id.* at 1543, 1546.

---

**23.** PX 142 at 494.

**24.** *Id.* at 495.

Plaintiffs' allegations of conflict of interest are examined with these principles in mind:

a) *Trade Group:* Plaintiffs allege that five of the seven governors in the Trade Group, who represent commercial metals firms, had conflicts of interest because the firms with which these five governors were affiliated engaged in one or more of the following activities: 1) held net long positions in silver futures contracts; 2) handled accounts for the Hunt defendants or did other silver related business with them; 3) were "bailed out by the Hunts in the fall of 1979 when the price rise was causing a severe financial strain on their firms"—meaning that these firms engaged in exchanges of futures for physical silver ("EFPs") and swaps with the Hunt defendants and other long defendants;[25] and/or 4) entered into EFPs with various long defendants in January 1980, which allegedly "assisted the trading conspirators in defeating the Comex's position limit rule."[26] The essential facts underlying these allegations—that some of the trade firms did hold net long positions and did do business with the Hunts—are undisputed. However, this evidence of participation in the silver market on the part of the Comex Trade Group governors or their firms shows no more than the existence of the theoretical conflicts which "inevitably 'taints' the decisions of self-regulating exchange boards." *Jordon,* 571 F.Supp. at 1539. There is no evidence that these business activities influenced any of the Trade Group governors to vote, act or fail to act in a particular way.[27]

b) *Floor Group:* Plaintiffs allege that three of the seven governors on the Floor Group, whose members were floor brokers or traders, had conflicts of interest. As to two of the three, plaintiffs allege that Moses Marx and Irving Redel traded on inside information. The only evidence of record on this allegation is testimony by Norton Waltuch that these two governors profited from large straddle positions in silver in fall 1979 placed on the basis of their knowledge that the Comex Board would shortly make an announcement predicted to result in a rise in silver prices. When asked the source of this information, however, Waltuch only answered, "I heard."[28] Furthermore, even if there was sufficient competent evidence to support the accusation of insider trading, plaintiffs have offered no evidence that unethical marketplace behavior influenced Marx's and Redel's votes as Comex governors. It is noted in this regard that Marx and Redel each were affiliated with trading companies holding predominantly short silver futures positions which stood to benefit from lower rather than higher silver prices.[29] As to the third governor, plaintiffs allege that John Morace "personally held a butterfly tax spread in silver which gave him an interest in postponing position limits and other serious regulations until after January 1, 1980."[30] The CFTC June 1985 report, however, concluded that this spread "was structured in a way that would be only minimally affected by overall silver price level movements," and that "Mr. Morace had no financial interest in the trend of silver price movements during this period which would have affected his views toward actions taken by the Comex Board."[31] Furthermore, there is again no evidence that this position affected Morace's actions as a Comex governor.

c) *Commission House Group:* Plaintiffs allege that five of the seven governors in the Commission House Group, whose members represent futures commission houses,

---

**25.** Plaintiffs' Memorandum at 75.

**26.** *Id.* at 76.

**27.** Indeed, it should be noted that one of the five allegedly conflicted Trade Group governors, Herbert Coyne of J. Aron & Co., did not attend Board meetings or participate in Board activities and votes after December 18, 1979, due to illness. PX 142 at 581.

**28.** Exhibits to Plaintiffs' Memorandum in Opposition to Defendants' Motions for Summary Judgment on the Conspiracy Claims, Section H, Exhibit 91 at 484–87, 486.

**29.** PX 142 at 515, 525.

**30.** Plaintiffs' Memorandum at 28–29.

**31.** PX 142 at 521–522.

had conflicts of interests. While there is insufficient evidence of conflict as to two of these governors,[32] the evidence concerning the other three—David T. Johnston of E.F. Hutton & Co., Inc. ("E.F. Hutton"), Jerome M. Spielman of Merrill Lynch Pierce Fenner & Smith ("Merrill Lynch"), and Charles Mattey of Bache Halsey Stuart Shields, Inc. ("Bache") warrants more careful examination.

All three of these governors represented commission houses with customer positions that were substantially long; all three commission houses also extended substantial loans to the Hunt defendants during the alleged conspiracy period which were collateralized by the Hunts' physical silver holdings. Of the three firms, Bache had the most direct and substantial stake in the high price of silver; moreover, Mattey himself derived a personal benefit from high silver prices. As the CFTC June 1985 report concluded:

> Though he had no silver positions in personal accounts, Mr. Mattey held a direct and substantial financial interest in the silver market from August 1979 through March 1980. While Bache customers held sizeable positions on both the long and short sides of the silver market, Mr. Mattey derived the majority of his personal income from commissions based on silver market transactions by customers related to the Hunt family who were substantially net long. Bache itself had a substantial financial interest in the Hunt customers accounts for several reasons. Beyond the size of the accounts themselves, the Hunts also owned a sizeable block of Bache corpo-

rate stock, and Bache had extended substantial loans to the Hunts collateralized by silver warehouse receipts, effectively giving Bache an interest in silver prices not moving rapidly downward.[33]

While the significant overlap of the Hunt defendants' financial interests in the silver market with those of E.F. Hutton, Merrill Lynch and Bache—particularly Mattey's personal financial involvement with the Hunt defendants—gives pause, it must be remembered that the applicable standard is not "appearance of impropriety." Nor is this litigation "an appropriate vehicle for retrospectively creating new standards of behavior" for Comex Board Members. *Jordon*, 571 F.Supp. at 1548. Rather, the only issue to be determined here is whether Johnston, Spielman and Mattey were influenced by their personal or corporate financial interests such that these interests were the sole or motivating force behind their votes and actions as Comex governors.

There is no such evidence of record. Perusal of the relevant Board minutes provides no evidence that these three governors lobbied or voted against measures to control the price of silver. As discussed below, many, if not most, of the Board votes concerning the silver market, including many of the votes in which margin requirements were raised, were unanimous decisions, in which Johnston, Spielman and Mattey voted in accordance with their colleagues. All three actually proposed measures to control the market: At the September 18, 1979 Comex Board meeting, Johnston proposed a margin increase to $20,0000 for all delivery months except

---

**32.** Wayman Glazier of Shearson Loeb Rhodes, Inc. ("Shearson") died in December 1979. This governor's seat was then vacant until mid-March 1980, when another representative of Shearson was elected. Furthermore, all the Hunt family accounts at Shearson were transferred to Bache Halsey in September 1979 after Shearson raised the margin requirements on these accounts to $20,000 per contract. PX 142 at 539-540. As for Charles Caruana, the commission house that he represented, Dean Witter Reynolds, Inc. ("DWR"), imposed liquidation-only trading on customers with positions in silver in September 1979. While members of the Hunt family retained accounts at DWR, there was minimal activity in these accounts,

and DWR extended no loans to the Hunts. *See* Exhibit J, Mandel Affidavit, *The Silver Crisis of 1980—A Report of the Staff of the U.S. Securities and Exchange Commission* at 204-06 (October 1982). Moreover, Caruana did not attend or vote at the key Board meetings at which decisions about the silver market were made. *See* Appendix, Table 2. Although both Shearson and DWR did hold customer accounts which were significantly net long, this fact in and of itself is insufficient to allow an inference of bad faith on the part of Glazier and Caruana.

**33.** PX 142 at 546.

September that the Board unanimously adopted.[34] At the September 27, 1979 meeting, Mattey proposed an increase in original margin to $50,000 for spot silver, which was unanimously adopted.[35] At the October 3, 1979 Board meeting, Spielman suggested that reasonable position limits be imposed; no vote was taken on this proposal.[36] In addition, Spielman abstained on many of the key Board votes concerning the silver market in recognition of the potential conflict of interest caused by Merrill Lynch's long customer interests.[37]

d) *Special Silver Committee.* Plaintiffs point out that John Morace, one of the four governors on the Special Silver Committee, held a personal silver position. However, as discussed above, there is no evidence that this position influenced Morace's actions as a governor. Furthermore, there are no allegations of conflict as to the other three members of the committee. Finally, the Special Silver Committee minutes do not break down the votes of the Committee by member; rather, the minutes indicate that the decisions of the Committee were unanimous.[38]

In sum, while it is undisputed that a number of the Comex governors were associated with businesses which either held net long silver positions, had net long customer accounts, or did business with the Hunt defendants, there is insufficient evidence of record that any of these business affiliations actually influenced the actions of any Comex governor. Bad faith can not be inferred from these theoretical conflicts. Moreover, there is no evidence of record that any alleged conflict of interest, even if proven to exist, tainted the actions of the Board as a whole. Most of the key Comex Board votes, including the October 3 and 4, 1979 decision to create the Special Silver Committee, the January 7, 1980 vote to impose position limits and the January 21, 1980 vote to impose liquidation-only trading were either unanimous or nearly unanimous.[39] Furthermore, there is no evidence that the governors whom plaintiffs allege were conflicted lobbied the other governors not to take certain actions or to delay taking action generally, or that they improperly used their influence in any other way.[40] Plaintiffs' speculations to the contrary are unsupported. In short, there is no evidence that the governors who allegedly had conflicts of interest acted or voted any differently than the governors who admittedly had no conflicts. Thus, as in *Jordon,* the conflicts alleged "could not be deemed ... to have tainted the actions of the entire Board." 571 F.Supp. at 1543.

\* \* \*

Comex's motion for summary judgment is granted. It is so ordered.

## APPENDIX
### TABLE I
<u>COMEX BOARD OF GOVERNORS</u> (September 1979–March 1980)

CHAIRMAN: LOWELL A. MINTZ

| GOVERNOR<br>TRADE GROUP | AFFILIATION |
| --- | --- |
| OSCAR BURCHARD (SSC)\* | THE ORE & CHEMICAL CORP. |
| HERBERT J. COYNE | J. ARON & COMPANY, INC. |

34. PX 6.

35. PX 9.

36. PX 10.

37. *See* Appendix, Table 2; PX 142 at 553.

38. Plaintiffs also allege that two members of another committee entitled The Special Margin Committee had silver interests. However, there is no evidence that this committee actually ever met or played any part in Board decision-making.

39. *See* Appendix, Table 2.

40. Plaintiffs deposed seven Comex witnesses, including Johnston, Spielman and Mattey. In August 1979, months after the close of discovery, plaintiffs moved under Fed.R.Civ.P. 56(f) for permission to depose four more of the 1979–1980 Comex governors. This motion was denied orally on the record on August 17, 1987.

| GOVERNOR | AFFILIATION |
|---|---|
| HENRY G. EISENBERG | BRANDEIS, GOLDSCHMIDT & CO., INC. |
| ROBERT G. GREMALD | AMETALCO, INC. |
| EDWARD W. HOFFSTATTER | SHARPS, PIXLEY, INC. |
| HENRY G. JARECKI | MOCATTA METALS CORP. |
| RAYMOND NESSIM | PHILIPP BROTHERS TRADING CORP. |
| FLOOR GROUP | |
| JOHN H. HANEMANN | |
| MELVIN LAZARUS | |
| MOSES MARX | UNITED EQUITIES CO. |
| JAMES M. McHALE | |
| LOWELL A. MINTZ | |
| JOHN L. MORACE (SSC) | SILGO CORPORATION |
| IRVING REDEL | REDEL TRADING CO., INC. |
| COMMISSION HOUSE GROUP | |
| CHARLES R. CARUANA | DEAN WITTER REYNOLDS INC. |
| JOHN D. COFFIN | DREXEL BURNHAM LAMBERT, INC. |
| DAVID T. JOHNSTON | E.F. HUTTON & COMPANY, INC. |
| GLAZIER/LAMBORN [1] | SHEARSON LOEB RHOADES, INC. |
| CHARLES MATTEY | BACHE HALSEY STUART SHIELDS, INC. |
| MARK J. POWERS (SSC) | THOMAS McKINNON SECURITIES, INC. |
| JEROME M. SPIELMAN | MERRILL LYNCH PIERCE FENNER & SMITH |
| GENERAL GROUP | |
| ANDREW F. BRIMMER (Chair, SSC) | PUBLIC MEMBER |
| WILLIAM F. SIMON | PUBLIC MEMBER |
| THEODORE THOMTE | |

* "SSC" = Special Silver Committee

1. Wayman Glazier died in December 1979; in March 1980 Mr. Lamborn was elected to replace him.

## TABLE II
### SELECTED VOTES CONCERNING THE SILVER MARKET
#### COMEX 1979/1980

| Board Members | 10/3/79 Special Silver Comm. | 1/7/80 Position Limits | 1/21/80 Liquidation Only Trading |
|---|---|---|---|
| Brimmer | Yes | Yes | – |
| Burchard | – | Yes | Yes |
| Caruana | – | – | – |
| Coffin | Yes | Yes | – |
| Coyne | Yes | – | – |
| Eisenberg | – | Yes | Abs. |
| Gremald | Yes | Yes | – |
| Hanemann | – | Yes | Yes |
| Hoffstatter | Yes | Yes | Yes |
| Jarecki | No | Abs. | Yes |
| Johnston | Yes | Yes | Yes |
| Glazier | Yes | – | – |
| Lazarus | Yes | Yes | Abs. |
| Marx | Yes | Yes | Yes |
| Mattey | No | Yes | – |
| McHale | Abs. | Yes | Abs. |
| Mintz | – | Yes | Yes |
| Morace | Abs. | Yes | Abs. |
| Nessim | – | Yes | Yes |
| Powers | – | – | – |
| Redel | Yes | Yes | Yes |
| Simon | – | Yes | – |
| Spielman | Abs. | Abs. | Abs. |

| Board Members Thomte | 10/3/79 Special Silver Comm. Yes | 1/7/80 Position Limits Yes | 1/21/80 Liquidation Only Trading Yes |
|---|---|---|---|
| | Defeated [1] 11 Yes 2 No 3 Abs. | Adopted 18 Yes 0 No 2 Abs. | Adopted 10 Yes 0 No 5 Abs. |

Source Document for Tables I and II: PX 142

1. This vote was repeated the next day, October 4, and passed unanimously. The second vote was apparently necessary because twelve affirmative votes were required to establish the Special Silver Committee.